# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-3630/3752

———————

Jaymie Quigley,                                  *
                                                 *
    Appellant/Cross-Appellee,            *
                                                 *   Appeals from the United States
v.                                               *   District Court for the
                                                 *   Northern District of Iowa.
Dale Winter,                                     *
                                                 *
    Appellee/Cross-Appellant.            *

———————

Submitted: October 20, 2009
Filed: March 16, 2010

———————

Before RILEY, HANSEN, and GRUENDER, Circuit Judges.

———————

RILEY, Circuit Judge.

Jaymie Quigley brought claims against her landlord, Dale Winter, pursuant to the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., and the Iowa Civil Rights Act (ICRA), Iowa Code ch. 216, alleging (1) sexual harassment; (2) sex discrimination; and (3) coercion, intimidation, threat, and interference with Quigley's enjoyment of her housing rights. A jury found in favor of Quigley on all claims and awarded her $13,685.00 in compensatory damages and $250,000.00 in punitive damages.[1] Quigley

———————

[1]Quigley also asserted a breach of contract claim against Winter, for which she was awarded $400.00 by the jury.

sought attorney fees and costs in the amount of $118,654.38. The district court reduced the punitive damages award to $20,527.50 and awarded Quigley $20,000.00 in attorney fees and $1,587.88 in costs.

Quigley appeals the district court's judgment, contending the district court erred in (1) reducing her punitive damages award, and (2) awarding her a reduced amount of attorney fees without conducting the proper analysis. Winter cross-appeals and asserts the district court committed various trial errors and erred in awarding any punitive damages to Quigley. We affirm the district court's judgment with respect to Winter's claims on cross-appeal, and we reverse with respect to Quigley's claims on appeal.

## I.     BACKGROUND
### A.     Factual Background[2]

Winter owned more than twenty rental homes in Sioux City, Iowa. Many of Winter's tenants were low-income women who received Section 8 housing vouchers (housing vouchers) from the Sioux City Housing Authority (SCHA) to help pay their rent. In 2000, Quigley, along with her then-husband and her four children, rented a home from Winter. Quigley used a housing voucher to pay her rent.

In 2002, Quigley informed Winter she was eligible to move into a larger home. Winter drove Quigley in his car to one of Winter's other properties. Quigley inspected the property, and when she returned to the car, Winter rubbed his hand down Quigley's arm and said, "[W]ell, how do you like it?" Quigley recalled this incident made her feel "[s]cared" and "yucky." Quigley, her boyfriend, and her children moved into a different rental property owned by Winter, using a housing voucher to pay the rent.

---

[2]We recite the relevant facts in the light most favorable to the jury's verdict.

In 2004, Quigley's boyfriend moved to Louisiana to visit his ill father. After Quigley's boyfriend moved out of the house, Winter behaved inappropriately toward Quigley on several other occasions. First, Quigley learned from a neighbor that Winter had been inside Quigley's house without prior notice when Quigley was not at home. When Quigley went to her bedroom, she noticed her housecoat, which had been hanging on the back of the bedroom door when she left, was now lying on her bed. Quigley confronted Winter about entering the home without giving prior notice, and Winter claimed he had to replace the screen on Quigley's bedroom window. Quigley's screen was not damaged and had not been replaced.

One evening, Winter came to inspect Quigley's house while she was making dinner for her children. On that occasion, Winter stood very close to Quigley and rubbed his genital area. Another time, Winter came to Quigley's house for an inspection at 9:30 or 10:00 in the evening without giving Quigley prior notice. Quigley's fourteen year-old sister was staying the night with her, and they were in their pajamas getting ready for bed. While conducting his inspection, Winter followed Quigley and her sister into a bedroom and then a bathroom, which made them feel uncomfortable. Quigley and her sister were watching television, and Winter lay down on Quigley's sectional couch after he completed the inspection. Winter stayed on the couch for five or ten minutes until Quigley said, "Hey, Dale, we're going to bed." Quigley had to tell Winter to leave "at least three times" before he left. Quigley also reported receiving phone calls from Winter at inappropriate times, sometimes as late as 2:30 or 3:00 in the morning. Winter sounded intoxicated when he called, and the phone calls made Quigley feel scared and worried about protecting her children and younger sister.

Quigley wanted to move out of the house because of Winter's conduct, but she would have lost her housing voucher if she broke the lease. Quigley met with her SCHA worker and reported Winter's inappropriate actions. Quigley asked if she could change the locks on her rental home, but the housing worker told her she could

not change the locks unless she gave Winter a key. The housing worker told Quigley she could get out of the lease without losing her housing voucher if Winter agreed to rescind the lease. When Quigley asked Winter to release her from the lease, Winter refused. Thereafter, Quigley changed the locks on her door without giving Winter a key.

About a month and a half before Quigley's lease ended, Winter showed up at her house while Quigley, her sister, and Quigley's friend were outside lying in the sun. Quigley approached Winter's vehicle and inquired whether she would be getting her deposit back. Winter fluttered his hand against Quigley's stomach and said, "My eagle eyes have not seen everything yet." Winter followed Quigley to the porch. Quigley observed Winter staring at Quigley's sister's chest. Quigley's sister was wearing shorts and a sport bra, so Quigley told her sister to "go get something on." Winter said to Quigley's sister, "You're really mature. How old are you?" When Quigley said her sister was "only 14," Winter said, "Well, she looks a lot more mature than you." Quigley's friend went to her car to get a cigarette, and Winter noticed the friend had a scar on her back. Winter traced the scar with his finger, without consent, pulling the friend's pants downward to see where the scar ended. Quigley moved out of the rental home, and Winter did not return her deposit.

Quigley filed a complaint with the Sioux City Human Rights Commission (SCHRC). The investigator who handled Quigley's complaint testified other single, female tenants of Winter's who were receiving housing assistance, corroborated Quigley's claims.

### B.     Procedural Background

In June 2006, Quigley filed a complaint against Winter in the district court, alleging sexual harassment; sex discrimination; and coercion, intimidation, threats, and interference with Quigley's rights, in violation of the FHA and the ICRA. Quigley also asserted a breach of contract claim against Winter based upon Winter's

failure to return Quigley's deposit. Winter brought a breach of contract counterclaim against Quigley, insisting Quigley owed him unpaid rent and failed to leave the rental home "in a clean and satisfactory condition."

A five-day jury trial began in April 2008. At the end of the trial, the district court instructed the jury to consider whether: (1) Winter discriminated against Quigley on the basis of her sex; (2) Winter sexually harassed Quigley; (3) Winter coerced, intimidated, or interfered with Quigley's exercise or enjoyment of her housing rights; (4) Winter breached his contract with Quigley by failing to return her deposit; and (5) Quigley breached her contract with Winter by failing to leave the rental property in a clean and satisfactory condition. The jury found in favor of Quigley, and against Winter, on Winter's counterclaim and each of Quigley's claims, and awarded Quigley $13,685.00 in compensatory damages for the housing claims, $400.00 for Quigley's breach of contract claim, and $250,000.00 in punitive damages.

After the district court entered judgment, Winter filed a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion to alter or amend the judgment, in part objecting to the award of punitive damages. Quigley moved for an award of attorney fees and costs in the amount of $118,654.38. Following a hearing on the motions, the district court entered an order (1) denying Winter's motions for a new trial and judgment as a matter of law, (2) reducing the award of punitive damages from $250,000.00 to $20,527.50, and (3) awarding Quigley $20,000.00 in attorney fees and $1,587.88 in costs. Quigley appeals the district court's judgment with respect to the amount of punitive damages and attorney fees. Winter cross-appeals, asserting various errors at trial and objecting to any award of punitive damages.

## II. DISCUSSION

### A. Winter's Claims on Cross-Appeal

We first address Winter's claims on cross-appeal. Winter maintains the district court erred in submitting to the jury, and in denying Winter's post-trial motions related to, the following claims: (1) hostile housing environment caused by sexual harassment; (2) "quid pro quo" sexual harassment; (3) sex discrimination; and (4) coercion, intimidation, and interference with housing rights. Winter next insists the district court made the following evidentiary errors: (1) admitting "me too" testimony from three of Winter's former female tenants; (2) admitting the SCHRC's probable cause determination and testimony from a SCHRC investigator; and (3) excluding medical records and testimony from a physician's assistant at Siouxland Mental Health related to Quigley's mental health.[3]

#### 1. Standards of Review

"We review a district court's denial of a motion for judgment as a matter of law de novo." Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir. 2008) (citation omitted). "We 'must affirm the jury's verdict unless, after viewing the evidence in the light most favorable to [Quigley], we conclude that no reasonable jury could have found in [her] favor.'" Id. (quoting Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir. 2002)). "We 'will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict.'" Id. (quoting Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004)).

A district court's decision to admit or exclude testimony is reviewed for an abuse of discretion. See, e.g., US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689 (8th Cir. 2009). "A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was

---

[3]We address Winter's claims concerning punitive damages and attorney fees in conjunction with our discussion of Quigley's claims on appeal.

a clear and prejudicial abuse of discretion." Id. at 689-90 (internal marks and quotations omitted).

## 2. Hostile Housing Environment Created by Sexual Harassment

As a preliminary matter, Winter questions whether a claim for hostile housing environment created by sexual harassment is actionable under the FHA. We conclude it is. See Neudecker v. Boisclair Corp., 351 F.3d 361, 364 (8th Cir. 2003) (recognizing a cause of action under the FHA for hostile housing environment created by disability harassment and citing, with approval, cases from other jurisdictions recognizing an FHA claim for hostile housing environment created by sexual harassment); see also DiCenso v. Cisneros, 96 F.3d 1004, 1008 (7th Cir. 1996) (recognizing an FHA claim for hostile housing environment created by sexual harassment); Honce v. Vigil, 1 F.3d 1085, 1089-90 (10th Cir. 1993) (same).[4]

Next, Winter insists there was insufficient evidence to support the jury's verdict in favor of Quigley on her hostile housing environment created by sexual harassment claim. In this case, there was sufficient evidence to support a hostile housing environment claim if a reasonable jury could find Quigley proved by a preponderance of the evidence Winter subjected her to unwelcome sexual harassment, and the harassment was sufficiently severe or pervasive so as to interfere with or deprive Quigley of her right to use or enjoy her home. See DiCenso, 96 F.3d at 1008 ("Applied to the housing context, a claim [of hostile housing environment caused by sexual harassment] is actionable 'when the offensive behavior unreasonably interferes with use and enjoyment of the premises.'" (quoting Honce, 1 F.3d at 1090) ("The harassment must be sufficiently severe or pervasive to alter the conditions of the housing arrangement."))). Cf. Neudecker, 351 F.3d at 364-65 (setting forth the elements of a hostile housing environment disability harassment claim).

---

[4]Winter all but conceded this issue at oral argument.

Winter denies he subjected Quigley to sexual advances or requests for sexual favors, and, alternatively, any sexual harassment Quigley experienced was not sufficiently severe or pervasive to support the jury's verdict. Viewing the evidence in the light most favorable to Quigley, we conclude Quigley presented sufficient evidence of numerous unwanted interactions of a sexual nature that interfered with Quigley's use and enjoyment of her home. Quigley testified Winter subjected her to unwanted touching on two occasions, made sexually suggestive comments, rubbed his genitals in front of her, placed several middle of the night phone calls to her home, made repeated unannounced visits, and, on one occasion, while Winter lay on Quigley's couch, had to be told to leave her home at least three times before he complied. We emphasize that Winter subjected Quigley to these unwanted interactions in her own home, a place where Quigley was entitled to feel safe and secure and need not flee, which makes Winter's conduct even more egregious.

In order to set aside the jury's verdict in favor of Quigley, Winter must show "a complete absence of probative facts" support the jury's verdict and no reasonable jury could have found in Quigley's favor. Heaton, 534 F.3d at 887. Winter simply cannot meet this high threshold for setting aside the jury's verdict.

### 3. "Quid Pro Quo" Sexual Harassment

Winter next contends the district court erred in denying his motion for judgment as a matter of law on Quigley's "quid pro quo" sexual harassment claim. "'Quid pro quo' harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." Honce, 1 F.3d at 1089; cf. Ogden v. Wax Works, Inc., 214 F.3d 999, 1006 n.8 (8th Cir. 2000) ("To prevail on her [employment discrimination] quid pro quo claim, [plaintiff] needed to prove (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for

receiving job benefits or her refusal to submit resulted in a tangible job detriment." (citation omitted)).

In reviewing the district court's denial of Winter's motion for judgment as a matter of law, we must view all facts in the light most favorable to Quigley and afford her all reasonable inferences . See HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 934 (8th Cir. 2007). "'[W]here conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn.'" Id. (quoting Canny v. Dr Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 900 (8th Cir. 2006)).

While the evidence of "quid pro quo" harassment was not overwhelming, after viewing the evidence in the light most favorable to Quigley, we conclude there was sufficient evidence to support the jury's verdict. Specifically, when Quigley inquired about the likelihood of receiving her deposit back from Winter, Winter fluttered his hand against Quigley's stomach and said, "My eagle eyes have not seen everything yet." The jury could reasonably infer Winter was telling Quigley the return of her deposit was conditioned upon Winter seeing more of Quigley's body or even receiving a sexual favor, which would amount to "quid pro quo" sexual harassment. We will not disturb the jury's verdict.

### 4. Coercion, Intimidation, or Interference with Housing Rights

Winter maintains the district court should not have denied Winter's post-trial motion on Quigley's coercion, intimidation, and interference claim under 42 U.S.C. § 3617. Winter contends Quigley's claim was "essentially a retaliation claim" and Quigley failed to prove retaliation.

Section 3617 states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

In addition, 24 C.F.R. § 100.400 gives the following examples of conduct prohibited by 42 U.S.C. § 3617:

(1)  Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling . . . because of . . . sex . . . .

(2)  Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the . . . sex . . . of such persons, or of visitors or associates of such persons.

. . . .

(5)  Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

In arguing there was insufficient evidence to support the jury's verdict, Winter focuses solely on the retaliation aspect of 42 U.S.C. § 3617.  As Quigley points out, retaliation is only one form of conduct prohibited under § 3617.  Viewing the evidence in the light most favorable to Quigley, we conclude there was more than sufficient evidence of coercion, intimidation, and interference with Quigley's enjoyment of her housing rights, other than retaliation, to support the jury's verdict.

### 5.  Discriminatory Housing Practices

Winter also takes issue with the district court's denial of his motion for judgment as a matter of law on Quigley's discriminatory housing practices claim.

Winter complains the district court erred in instructing the jury and the jury's verdict was not supported by sufficient evidence.

With respect to discriminatory housing practices, the district court instructed the jury as follows in Instruction No. 8A:

> The plaintiff must prove by the preponderance of the evidence that the defendant engaged in a discriminatory housing practice. The following are considered discriminatory housing practices prohibited by the present laws:
>
> First, it is unlawful under the Fair Housing Act for a landlord to refuse to rent, or otherwise make unavailable houses or apartments or dwellings because of the tenant or applicant's sex.
>
> Second, it is unlawful under the Fair Housing Act for a landlord to impose different terms, conditions or privileges related to the rental of a house or apartment or dwelling, or to deny or limit the terms, conditions, or privileges of the rental of an apartment or house or dwelling because of sex.
>
> Third, it is unlawful under the Fair Housing Act to make statements with respect to the rental of a house, apartment or dwelling that indicate any preference, limitation, or discrimination based on sex, or that indicate any intention to make such a preference, limitation or discrimination.
>
> Fourth, it is unlawful under the Fair Housing Act to coerce, intimidate, or interfere with any person in the exercise and enjoyment of rights granted and protected by the Fair Housing Act.
>
> If you find that the plaintiff has shown one or more of these acts or practices by the preponderance of the evidence, you must find that the plaintiff has shown that the defendant committed a discriminatory housing practice.

If the plaintiff has failed to prove by a preponderance of the evidence that the defendant has committed one of the above listed acts, then your verdict must be for the defendant.

The next jury instruction provided,

The plaintiff must prove by a preponderance of the evidence that sex was a motivating factor in defendant's commission of any discriminatory housing practice.

The plaintiff is not required to show that her sex was the sole reason for the defendant's action; the plaintiff is only required to show that sex was one motivating factor behind the challenged conduct.

The corresponding question on the verdict form, Question No. 2, asked the jury, "Do you find by a preponderance of the evidence that defendant discriminated against plaintiff on the basis of sex in violation of the present laws?"[5]

Winter maintains Instruction No. 8A was erroneous because Quigley presented no evidence (1) Winter "refused to rent or otherwise made unavailable dwellings to her because of her sex"; (2) Quigley's "rental agreement was any different than those of [Winter's] other tenants, . . . her rent was raised or lowered, [or] any act was taken with respect to the above matters at all, let alone because of [Quigley's] sex"; or (3) Winter "made a statement with respect to rental of his property that indicated a preference, limitation, or discrimination based on sex." Winter also protests Instruction No. 8A's inclusion of the following language: "[I]t is unlawful under the [FHA] to coerce, intimidate, or interfere with any person in the exercise and

_____

[5]Quigley suggests Question No. 2 on the verdict form was not directly tied to Instruction No. 8A. We reject Quigley's position. While Question No. 2 may not have explicitly referenced Instruction No. 8A, there was no other instruction explaining what would constitute discriminatory housing practices or sex discrimination.

enjoyment of rights granted and protected by the [FHA]," because another jury instruction and question on the verdict form addressed Quigley's claim of coercion, intimidation, and interference with housing rights. Because there was only one blank on the verdict form for the jury to fill in the amount of compensatory damages for all three of Quigley's FHA claims, Winter raises the possibility Quigley recovered damages twice under the same theory of recovery. Winter claims these alleged errors in the jury instructions and verdict form entitle him to a new trial.

Before trial, Winter submitted proposed jury instructions and a proposed verdict form to the district court. Winter's proposed jury instructions included an instruction on unlawful discriminatory practices under the FHA which was similar to Instruction No. 8A. Winter's proposed instruction stated it was unlawful under the FHA to "[t]hreaten, intimidate or interfere with persons in their enjoyment of a dwelling because of the sex of such persons, or of visitors or associates of such persons." Winter's proposed verdict form also included only one blank for the jury to award compensatory damages for Quigley's FHA and ICRA claims. Later, during the jury instruction conference, Winter made a general objection to the inclusion of Instruction No. 8A, and he made some specific objections to the initial version of Instruction No. 8A. Winter did not dispute the statement of the law, only contesting whether any evidence existed for each violation and preferring a simple instruction on sexual harassment. Winter did not object to the portion of the instruction concerning coercion, intimidation and interference with FHA rights, nor did Winter object to the final form of Instruction No. 8A. Winter likewise did not object to having only one line on the verdict form for compensatory damages.

In order to preserve for appeal an objection to a jury instruction or verdict form, "appellants must raise specific objections to the form or content of" the instruction or verdict form before the district court. Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 770 (8th Cir. 1998) (citation omitted); see also Fed. R. Civ. P. 51(c)(1) ("A party who objects to an instruction . . . must do so on the record, stating distinctly the

-13-

matter objected to and the grounds for the objection."). Absent a specific objection, we will review only for plain error. See Horstmyer, 151 F.3d at 770. Winter did not properly preserve the objections he now makes to Instruction No. 8A and the verdict form. We thus review his claims for plain error.

"'Plain error is a stringently limited standard of review,' especially in the civil context, and must result in a miscarriage of justice in order to compel reversal." Id. at 771 (quoting Rush v. Smith, 56 F.3d 918, 925 (8th Cir. 1995) (en banc)). Jury instructions must fairly and adequately state the law, but "we will not find error in instructions simply because they are technically imperfect or are not a model of clarity." Hastings v. Boston Mut. Life Ins. Co., 975 F.2d 506, 510 (8th Cir. 1992) (citation omitted). Having reviewed the jury instructions in their entirety, we conclude Winter has not shown there was plain error in either the form or content of the instructions and verdict form.

Moreover, viewing the evidence in the light most favorable to Quigley, we conclude there was sufficient evidence to support the jury's verdict in favor of Quigley on her sex discrimination claim. Winter's contention that he had a legitimate, non-discriminatory reason for any discriminatory behavior fails because the jury's verdict demonstrates the jury did not believe Winter. Because we find the district court sufficiently submitted each claim to the jury, we find no error in the district court's use of only one space for compensatory damages on the verdict form.

### 6.     Evidentiary Issues

We now turn to Winter's claim that the district court made improper evidentiary rulings regarding the admission of testimony at trial. "A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion." US Salt, 563 F.3d at 689-90 (internal marks and quotations omitted). "The reason for [our] extremely deferential standard of review is obvious: A Rule 403 ruling—as

much as any type of determination made by a district court—depends on factors that are uniquely accessible to the trial judge who is present in the courtroom and uniquely inaccessible to an appellate judge who must take the case on a cold record." Olson v. Ford Motor Co., 481 F.3d 619, 623 (8th Cir. 2007).

Winter first claims the district court erred in admitting the testimony of Winter's former tenants, Lisa Scofield, Kayla Mobley, and Holly Cook. These three women testified Winter also subjected them to sexual harassment while they were Winter's tenants. Winter claims the testimony of these three women was irrelevant because there was no evidence Quigley knew the women or observed any of the events to which they testified.

In Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379 (2008), the Supreme Court considered the admissibility of so-called "me too" evidence in an employment discrimination case. The Court determined such evidence was neither per se admissible nor per se inadmissible. See id. at 386-88. Rather, "[t]he question whether evidence of discrimination [against other employees] by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." Id. at 388. The Court also observed, "In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings." Id. at 384.

Our review of the trial transcript reveals the district court carefully analyzed the admissibility of each witness's testimony. The district court refused to permit Mary Davis, another former tenant of Winter, to testify after hearing her proposed testimony outside the presence of the jury. The district court excluded this testimony because Davis had last rented from Winter in 1994, and the district court found her testimony was too remote. Affording the district court broad discretion, we hold the district

-15-

court properly performed its gatekeeping function and did not abuse its discretion in admitting the evidence of Winter's three former tenants.

Winter next takes issue with the district court's decision to admit the testimony of Patricia Johnson (Johnson), a SCHRC investigator, and the SCHRC's probable cause determination. Winter suggests "Johnson's testimony regarding the [SCHRC probable cause] determination and how it was made was . . . prejudicial and usurped the role of the jury." Winter also maintains "Johnson's testimony as a whole was littered with hearsay and irrelevant evidence that was unfairly prejudicial to [Winter] and should have been excluded in its entirety."

"In an employment discrimination case, the decision whether to admit or exclude administrative findings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court." Doss v. Frontenac, 14 F.3d 1313, 1318 (8th Cir. 1994) (citations omitted). In this case, the district court instructed the jury regarding the probable cause determination and the testimony concerning the probable cause determination. The instruction stated:

> You have heard evidence about an investigation performed by the [SCHRC] and that organization's finding of "probable cause" regarding the issues in this case. You may consider this finding by the [SCHRC] as evidence as set out in Exhibit 4. The "probable cause" finding by the [SCHRC] is not a finding you are bound by. It is just a step in procedure and is not a finding by a preponderance of the evidence. You, as a jury, not the [SCHRC], are the ones to decide whether or not the issues presented for your consideration have been proved or not.

Even if the admission were indeed an error, any possible prejudice was cured by the above instruction. See Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir. 1984) ("To admit the report under these circumstances would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw[.]"). With regard to Johnson's testimony as a whole, Winter makes only general

-16-

accusations of irrelevancy and prejudice, but he fails to cite any specific examples. Under the circumstances, we find no abuse of discretion in the district court's admission of Johnson's testimony.

Finally, Winter argues the district court improperly excluded Quigley's records from Siouxland Mental Health (Siouxland) and the testimony of Siouxland physician's assistant Dawn Nolan (Nolan). Before trial, Quigley moved in limine to exclude "any evidence, comment or argument" related to Quigley's Siouxland mental health records and her history of, and treatment for, mental health conditions. The district court granted the motion, excluding admission of Quigley's records, except for a portion to which the parties stipulated. The parties stipulated to the following jury instruction: "The plaintiff has a history of depression and anxiety prior to January, 2004."

During her trial testimony, Johnson of the SCHRC reported Quigley had received counseling services at Siouxland for depression caused by the sexual harassment. This testimony was elicited by Winter's attorney during cross-examination. Winter then sought to introduce Nolan's testimony to prove Quigley did not report sexual harassment to Nolan and lied to Johnson when she said she had. Quigley objected to Nolan testifying, arguing Nolan's testimony would violate the psychiatrist-patient or physician-client privilege. The district court heard Nolan's proposed testimony outside the presence of the jury. The district court determined Nolan's testimony was inadmissible because Winter failed to prove Quigley did not tell anyone at Siouxland about the sexual harassment. We find no abuse of discretion in the district court's exclusion of Quigley's medical records and Nolan's testimony.

**B.    Quigley's Claims on Appeal**

Having found no reversible trial error, we turn to Quigley's claims on appeal. Quigley claims the district court (1) improperly reduced the jury's punitive damage award from $250,000.00 to $20,527.50, and (2) failed to conduct a proper analysis of Quigley's entitlement to attorney fees and awarded an insufficient amount of attorney fees to Quigley. Conversely, Winter claims the district court erred in submitting punitive damages to the jury and in awarding any amount of punitive damages or attorney fees to Quigley.

**1.    Punitive Damages**
**a.    Punitive Damages Jury Instruction**

We first address Winter's contention that the district court erred in allowing the jury to consider punitive damages. "The [FHA] provides for the recovery of punitive damages by victims of discriminatory housing practices." Badami v. Flood, 214 F.3d 994, 997 (8th Cir. 2000) (citing 42 U.S.C. § 3613(c)(1) (1994)). We apply the same standard for punitive damages in [FHA] cases as we do in employment discrimination and 42 U.S.C. § 1983 civil rights cases. Id. at 997 (referencing Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999)). "Punitive damages are appropriate in a federal civil rights action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Id. at 997 (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). In Kolstad, a gender discrimination case, the Supreme Court held "[t]he terms 'malice' and 'reckless [indifference]' ultimately focus on the actor's state of mind." Kolstad, 527 U.S. at 535 (citations omitted). They "pertain to the [defendant's] knowledge that [he] may be acting in violation of federal law, not [his] awareness that [he] is engaging in discrimination." Badami, 214 F.3d at 997 (quoting Kolstad, 527 U.S. at 535). Thus, "it is sufficient that a defendant 'discriminate in the face of a perceived risk that [his] actions will violate federal law to be liable in punitive damages.'" Id. (quoting Kolstad, 527 U.S. at 536).

The district court determined Quigley had presented sufficient evidence to justify instructing the jury on punitive damages, because Winter admitted at trial he knew sexual harassment was unlawful, he had been a landlord for many years and managed many properties, he had worked with various governmental agencies to provide subsidized housing, and his lease agreement with Quigley stated he, as the landlord, was not to discriminate on the basis of sex. We agree with the district court. The district court did not err in submitting punitive damages for the jury's consideration.

### b. Reasonableness of the Punitive Damages Award

The jury found Quigley was entitled to punitive damages in the amount of $250,000.00, and the district court entered judgment. Winter then filed a motion to amend the judgment to reduce the punitive damages award. The district court noted the punitive damages award was more than eighteen times the compensatory damages award ($13,685.00) and found the award was excessive and did not comport with due process. The district court reduced the award to $20,527.50, which amounted to one and a half times the compensatory damages award, "for the simple reason that [Winter's] conduct . . . can be considered only as to what he said and did directly to [Quigley]."

Quigley challenges the district court's analysis, arguing the jury's punitive damages award complied with due process and the original award should be reinstated. "We review a district court's legal conclusions regarding punitive damages de novo." Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir. 2000) (citation omitted). We also review the proportionality determination de novo. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001) (citation omitted).

> The factual findings made by the district courts in conducting the
> excessiveness inquiry, of course, must be accepted unless clearly

-19-

erroneous. . . . But the question whether a [punitive damages award] is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate.

Id. (internal marks and citation omitted).

To assess the reasonableness or excessiveness of a punitive damages award, we consider: (1) "the degree of reprehensibility of the defendant's conduct," (2) the ratio between punitive damages and actual harm (compensatory damages), and (3) "the civil or criminal penalties that could be imposed for comparable misconduct." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 580-81, 583 (1996).

### i.    Reprehensibility

In Gore, the Supreme Court declared the degree of reprehensibility was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Id. at 575.   In assessing the degree of reprehensibility, we must consider whether

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citing Gore, 517 U.S. at 576-77).

The district court determined Winter's conduct was not sufficiently reprehensible to justify the jury's punitive damages award.  The district court may have based this finding on an assumption the jury considered Winter's conduct toward

-20-

other tenants, and not just the conduct directed toward Quigley, in arriving at the punitive damages amount. However, as Quigley notes, the jury instruction on punitive damages clearly stated the jury was to consider "[Winter]'s conduct only as against [Quigley]" in assessing punitive damages. We have no reason to believe the jury disregarded the district court's instructions.

Winter's conduct was reprehensible. Quigley lived alone with small children at the time of Winter's harassment, and she had few, if any, alternative housing options. Quigley's financial vulnerability was evidenced by her need for Section 8 housing vouchers. Winter held a certain level of power over Quigley and her family. Winter repeatedly subjected Quigley to inappropriate conduct during Quigley's tenancy, and Winter's conduct was unquestionably intentional and more than churlish. Most significant, Winter's conduct intruded upon Quigley's sense of security in her own home. However, as we explain below, we do not believe the degree of reprehensibility of Winter's conduct justifies the jury's large punitive damages award.

### ii.    Ratio Between Punitive Damages and Actual Harm

The second Gore factor, the ratio between punitive and compensatory damages, is the "most commonly cited indicium of an unreasonable or excessive punitive damages award." Gore, 517 U.S. at 580. Punitive "damages must bear a 'reasonable relationship' to compensatory damages." Id. What constitutes a "reasonable relationship" varies from case to case. The Supreme Court "ha[s] consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." Id. at 582 (citation omitted). The Court explained,

> low awards of compensatory damages may properly support a higher
> ratio than high compensatory awards, if, for example, a particularly
> egregious act has resulted in only a small amount of economic damages.
> A higher ratio may also be justified in cases in which the injury is hard

to detect or the monetary value of noneconomic harm might have been difficult to determine.

Id.

Yet, later, in Campbell, the Court declared, "Our jurisprudence and the principles it has now established demonstrate . . . few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Campbell, 538 U.S. at 425. The Court continued, "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." Id. The Court reiterated there was "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." Id. (citing Gore, 517 U.S. at 581 n.33). The district court then declared, "While these ratios are not binding, they are instructive." Id.

In Wallace v. DTG Operations, Inc., 563 F.3d 357, 359, 362 (8th Cir. 2009), a retaliation case, our court found a punitive damages award, which was "approximately sixteen times greater than all of the actual damages combined" was excessive. Citing Campbell, we reasoned, because the jury's award of $30,000 in actual damages was not a nominal amount, "a single-digit multiple should be the outer limit on [the punitive damages] award." Id. at 362. We observed, the Supreme Court found a punitive damages award "'more than 4 times the amount of compensatory damages . . . close to the line'" of constitutionality. Id. at 363 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-4 (1991)). Based on the Court's guidance in Campbell and Haslip, we found "a four-to-one ratio" was an appropriate ratio. Id.

Recognizing we are not bound by a rigid mathematical formula, we nevertheless, are persuaded a single digit multiplier is appropriate in the present case. We take our guidance from the Supreme Court's assessment of single-digit

-22-

multipliers. Quigley was awarded $13,685.00 in compensatory damages, which is not a nominal amount. We find the circumstances of this case and due process do not justify a punitive damages award eighteen times greater than the compensatory damages and, agreeing with the district court, conclude the jury's punitive damage award was excessive.

### iii.    Sanctions for Comparable Misconduct

We turn then to the final Gore factor, a comparison between the punitive damages award and the civil and criminal penalties available for comparable misconduct. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" Gore, 517 U.S. at 583 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 282, 301(1989) (O'Connor, J., concurring in part and dissenting in part)).

Quigley points out 42 U.S.C. § 3614 permits the Attorney General to commence a civil action against "any person . . . engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by the [FHA]." Section 3614(d)(1)(C), as adjusted by the Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5(a)(4), 104 Stat. 891, and 29 C.F.R. § 85.3(b)(3), states a court may grant relief for a first violation in an amount not exceeding $55,000.

While we agree with the district court that the jury's punitive damage award was excessive, we disagree with the district court's assessment that $20,527.50, which is one and a half times the compensatory award, sufficiently reflects the reprehensibility of Winter's conduct. We conclude an appropriate punitive damages award in this case is $54,750. This amount is four times greater than Quigley's compensatory damages ($13,685.00), which we find is an appropriate ratio under the circumstances of this case. This amount comports with due process, while achieving

-23-

the statutory and regulatory goals of retribution and deterrence.  See Campbell, 538 U.S. at 425.

### 2.    Attorney Fees

Finally, Quigley contests the district court's judgment with respect to the attorney fee award.  The district court granted Quigley's motion for attorney fees, but only awarded her $20,000.00 of the $117,066.50 Quigley requested.  "'We review the district court's award of attorney fees for abuse of discretion.'" Heaton, 534 F.3d at 887 (quoting Ollis v. HearthStone Homes, Inc., 495 F.3d 570, 576 (8th Cir. 2007)).

### a.    Entitlement to Attorney Fees

"The prevailing party in FHA litigation may be awarded costs and a reasonable attorney's fee."  Oxford House-A v. City of Univ. City, 87 F.3d 1022, 1024 (8th Cir. 1996) (citing 42 U.S.C. § 3613(c)(2)).  Winter does not contest Quigley was a prevailing party; however, Winter suggests Quigley may not be entitled to attorney fees because she had a contingency fee agreement with her attorneys.  Quigley's attorney stated, "[W]e have agreed with [Quigley] . . . that we would take a contingency fee amount, which is 33 1/3 [%], or what the court would grant us in statutorily granted attorney fees.  That's an either/or. We don't get both."

Winter cites two 1986 cases from outside our circuit in support of his proposition that the existence of a contingency agreement bars an award of attorney fees.  See Tolliver v. Amici, 800 F.2d 149, 152 (7th Cir. 1986); Keith v. Volpe, 644 F. Supp. 1317, 1319 (C.D. Cal. 1986), aff'd, 858 F.2d 467 (9th Cir. 1988).  We consider Tolliver and Keith inapplicable and not contrary to our decision. As Quigley notes, these two cases were decided before the 1988 amendments to the FHA.  Before the amendments, an award of attorney fees under the FHA was only available to "a prevailing plaintiff [who was] not financially able to assume said attorney fees."  See Tolliver, 800 F.2d at 152 (citing 42 U.S.C. § 3612(c) (1986)).  The current version of the FHA does not limit attorney fees to plaintiffs or to those who are not financially

able to assume the fees; rather, "the *prevailing party*, other than the United States, [may recover] a reasonable attorney's fee." 42 U.S.C. § 3613(c)(2) (emphasis added). "The attorney's fees provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable." Blanchard v. Bergeron, 489 U.S. 87, 96 (1989) (addressing attorney fees under 42 U.S.C. § 1988). The district court did not err in finding Quigley was entitled to attorney fees.

### b. Amount of Attorney Fees

We now consider whether the district court erred in its manner of calculation or in the amount of attorney fees awarded to Quigley. The Supreme Court has stated,

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.

Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983) (internal citations omitted).[6] See also Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005) ("The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates." (quoting Fish v. St. Cloud State Univ., 295 F.3d 849, 851 (8th Cir. 2002)).

The district court's explanation for its award of attorney fees is puzzling. The court stated, "There is no need to discuss the lodestar calculations or the skill and experience of the plaintiff's lawyers." Instead, the district court relied upon the "Kloberdanz theory." This Kloberdanz theory apparently came from an unpublished district court case, United States v. Kloberdanz, No. CR 76-2013 (N.D. Iowa Nov. 30, 1976) (McManus, J.), which did not address the issue of attorney fees. According to the district court, Kloberdanz involved the criminal prosecution of a postal employee for theft, and the Kloberdanz court found there was no need for an excessive fine because, in the district court's words, "it was a two bit case and he was going to receive a two bit fine." The district court then noted Quigley's case "is not a two bit case . . . [but] there is still a matter of justice, there is still a matter of basic fairness, there is still a matter of equity." The district court declared its belief that it was "appropriate to determine or consider the effect on [Winter], whether he can pay [the attorney fees] or not." The district court concluded, "[W]hile they certainly are good lawyers and they certainly did a good job, . . . attorney fees in the sum of $20,000.00 are appropriate."

The district court's failure, under the circumstances here, to analyze Quigley's entitlement to attorney fees under the lodestar approach was an abuse of discretion. See De Jesús Nazario v. Morris Rodríguez, 554 F.3d 196, 207 (1st Cir. 2009)

_____

[6]While Hensley involved an award of attorney fees under 42 U.S.C. § 1988, the Hensley Court made clear "[t]he standards set forth in [the] opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" Hensley, 461 U.S. at 433 n.7.

("Normally, a district court begins with a lodestar analysis, because failure to conduct such an undertaking 'creates a substantial burden upon the district court to account for its actions.'" (quoting Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 338 (1st Cir. 1997))); Moton v. Nathan & Nathan, P.C., 297 F. App'x 930, 932 (11th Cir. 2008) ("Although the district court admittedly has wide discretion in this arena, we nonetheless are constrained to hold that the district court abused its discretion by failing to perform any 'lodestar' calculation at all." (citation omitted)); Pa. Envt'l. Defense Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 232-33, 235 (3d Cir. 1998) (reversing and remanding based on the district court's failure to use the lodestar method in awarding attorney fees); Morales v. City of San Rafael, 96 F.3d 359, 363-64, 365 (9th Cir. 1996) (same).

Furthermore, we find the district court erred in its consideration of Winter's ability to pay. Even if a defendant's ability to pay could be an appropriate consideration in awarding attorney fees, the record in this case adequately supports Winter is a substantial owner of real estate, and Winter did not submit any evidence of his financial situation or his net worth to address any issue of his inability to pay a substantial fee award.

In lieu of remanding the case to the district court, Quigley requests us to conduct a lodestar calculation and award the appropriate amount of attorney fees. Quigley insists a remand to the district court would create a "serious risk of substantial continued litigation," because, based on the district court's previous decision, Quigley believes "another appeal to [our court] may be necessary if the issue is remanded."

"A request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437. The Eleventh Circuit has interpreted this command to authorize circuit courts to "determine for ourselves, once we conclude that the district court has abused its discretion, how many hours were reasonably spent in litigation." Dillard v. City of Greensboro, 213 F.3d 1347, 1355 (11th Cir. 2000) (citation

omitted).  See also 28 U.S.C. § 2106 (providing circuit courts of appeals the power to "direct the entry of such appropriate judgment . . . as may be just."); Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 299 (1st Cir. 2001) (foregoing a remand and imposing an award of punitive damages where the district court erred in its attorney fees calculation).  We have not located any cases from our circuit where we have foregone a remand under these circumstances.  Cf. In re Kujawa, 270 F.3d 578, (8th Cir. 2001); Thomlinson v. City of Omaha, 63 F.3d 786 (8th Cir. 1995); Rydder v. Rydder, 49 F.3d 369 (8th Cir. 1995); Allen v. Higgins, 902 F.2d 682 (8th Cir. 1990).  However, like the First and Eleventh Circuits, we believe the record before us is clear, remand would be inefficient, and it is necessary for us to determine an appropriate attorney fees award in this case in order to comply with the Supreme Court's command that "[a] request for attorney's fees should not result in a second major litigation," Hensley, 461 U.S. at 437.[7]

While we agree with Quigley that the district court abused its discretion in significantly reducing Quigley's requested attorney fees without conducting the proper analysis and in basing its decision on unsupported considerations, we do agree with the district court's determination that Quigley's attorney fees request was excessive.  We have reviewed in depth Quigley's supporting documentation. According to one of Quigley's attorneys, Scott Moore, the preparation of Quigley's case involved 437.7 hours of work performed by six attorneys and two paralegals from Baird Holm, LLP, an Omaha, Nebraska, law firm.  These lawyers and their firm are deservedly highly respected, and their success in this case is commendable. Although we do not question the ethics or abilities of these attorneys, in our view, the

---

[7]We do not argue with the dissent that the usual procedure is to remand any further consideration of an attorney fee award to the district court because the district court typically is "in a better position to perform this time-consuming and fact-intensive task."  However, based on the circumstances and record of this case, we believe it is more efficient and appropriate for our court to decide the attorney fee award now.

complexity of the issues in this case simply did not warrant the requested amount of "lawyering." We also conclude there was a significant amount of duplicative work, in part caused by transitions in the attorneys of record. For those reasons, we determine it is reasonable and appropriate to reduce the hours expended by each of the attorneys and paralegals by one-third, while leaving their hourly rates undisturbed. See Hensley, 461 U.S. at 434 ("Cases may be overstaffed.").

Using the adjusted number of hours, and multiplying by the respective hourly rates, we arrive at the following lodestar calculation.

| **Attorneys** | **Reasonable Fees** |
|---|---|
| Scott P. Moore | $44,110.00 |
| Kirk S. Blecha | $    189.00 |
| Christopher R. Hedican | $21,641.00 |
| Allison D. Balus | $  4,935.00 |
| Alison A. Dempsey | $  3,819.33 |
| Mark P.A. Hudson | $  2,060.00 |
| **Paralegals** | |
| Kris P. Kimball | $  1,045.00 |
| Sharada A. Rajappa | $    245.00 |
| **Total:** | **$78,044.33** |

"The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" Hensley, 461 at 434. Quigley obtained excellent results, as the jury found in her favor on all claims. We conclude no other upward or downward adjustments are mandated in this case. We thus conclude a reasonable attorney fee award in this case is $78,044.33.

## III.  CONCLUSION

For the reasons stated in this opinion, we affirm the district court's judgment with respect to Winter's claims on cross-appeal.  With respect to Quigley's claims on appeal, we reverse and remand the case to the district court with instructions to award Quigley $54,750.00 in punitive damages and $78,044.33 in attorney fees, together with $1,587.88 in non-taxable costs.[8]

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I join all of the Court's opinion with the exception of the decision to forego a remand to the district court for a proper calculation of the attorneys' fee award.  I do not interpret the Supreme Court's statement in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), about avoiding a "second major litigation" to encourage courts of appeals to usurp the traditional role of district courts in determining the proper fee award. Rather, I read *Hensley* to suggest that it is the deferential standard of review, not our ability to calculate a fee award de novo, that alleviates the Supreme Court's efficiency concerns, including "avoiding frequent appellate review of what essentially are factual matters." *See Hensley*, 461 U.S. at 437; *see also id.* at 430 n.3 (listing twelve factors to consider in calculating a fee award).  We review the amount of an award using the deferential abuse of discretion standard precisely because "of the district court's superior understanding of the litigation." *See id.* at 437.

The Court today declares that because "the record before us is clear" and "remand would be inefficient," it is "necessary" for us to determine the appropriate attorneys' fee award. *Ante*, at 28.  Because the same can be said for most, if not all, attorneys' fee disputes that are appealed, it will henceforth become necessary for us to calculate the proper attorneys' fee award as a matter of course, whenever we find an abuse of discretion.  District courts are in a far better position to perform this time-

---

[8]Winter does not contest Quigley's costs.

consuming and fact-intensive task. As a result, I would adhere to our previous cases in which we have uniformly remanded for the district court to re-calculate the proper attorneys' fee award. *See, e.g.*, *Lash v. Hollis*, 525 F.3d 636, 643 (8th Cir. 2008); *ante*, at 27-28 (collecting cases); *see also Gisbrecht v. Barnhart*, 535 U.S. 789, 809 (2002) (similarly remanding for a new award calculation); *Hensley*, 461 U.S. at 440 (same). On this issue alone, I respectfully dissent.

_____