# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 22, 2012

## SARAH HURST v. COLMAN S. HOCHMAN, ET AL.

### Appeal from the Circuit Court for Hamilton County
### No. 11C176      W. Jeffrey Hollingsworth, Judge

---

### No. E2012-00239-COA-R3-CV-FILED-DECEMBER 14, 2012

---

Sarah Hurst ("Hurst") sued Colman S. Hochman ("Hochman") and Hochman Family Partners, L.P. ("the Partnership") alleging that Hochman had committed a battery upon her, and seeking damages for battery and intentional infliction of emotional distress among other things. After a trial, the Trial Court entered its Final Decree that, *inter alia*, awarded Hurst damages of $2,500 against Hochman for battery; denied Hurst's claims for intentional infliction of emotional distress, discrimination under the Fair Housing Act, and punitive damages; and dismissed Hurst's claims against the Partnership. Hurst appeals raising issues regarding whether the Trial Court erred in denying her claim of discrimination under the Fair Housing Act and in dismissing her claims against the Partnership. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Whitney Durand, Chattanooga, Tennessee, for the appellant, Sarah Hurst.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellees, Colman S. Hochman, and Hochman Family Partners, L.P.

# OPINION

## Background

Hurst rented an apartment from Hochman[1] in December of 2009. In January of 2011, Hurst sued Hochman and the Partnership. The case was tried in August of 2011.

Hurst testified that she, her boyfriend, and her daughter moved into the apartment she rented from Hochman in January of 2010. She testified that when she rented the apartment: "[Hochman] told me that whenever I was to pay rent or anything, I would meet him or he would come to my place to get it. And he told me that whenever I called, to call him specifically."

Hurst testified that in February of 2010:

I paid rent to [Hochman]. He came to my apartment and I gave him the rent. And he put the receipt between my cleavage, because I was wearing a dress. I was wearing a dress and he put the receipt between my cleavage. But he had started doing sexual things before I paid the second month's rent.

Like, I had my girlfriend Rita there, and I had lost the keys to my apartment. So I asked him if he could bring me a duplicate and that I could pay him or whatever for the key he made. And then he was asking me what I did. I was telling him that I owned a cleaning service, you know.

He kept saying, I know that you do something other than that, you know. And I was like, no, I own a cleaning service. I clean people's houses for a living. That's what I do.

And he started feeling on my hands, and he said, These ain't hard-working hands. And he started feeling my friend Rita's hands. And he was telling me that he knew that I did something other than just clean houses. He said he knew I didn't clean houses, I did something else. And he wanted me to tell him what it was. I told him I don't do anything but clean houses.

---

[1]Hochman executed the lease as Colman S. Hochman. Hochman testified at trial that the Partnership actually owns the property. He testified that he made a mistake in executing the lease in his own name rather than in the name of the Partnership.

When asked about her reaction when Hochman touched her the first time, Hurst stated:

I didn't say anything. I couldn't believe that he had done it. I pulled back and I got the receipt and I just looked at him, but I didn't say anything at that point. I just couldn't believe he had done it.

From then on it just escalated more and more, I guess because I didn't say anything.

Hurst testified that her then three-year old daughter was present almost every time that Hochman touched her. Hurst further testified:

[Hochman] reached his hand up my shirt. And my daughter was standing right there. I pulled away and pushed his hand away. I said, My daughter is standing right there staring at you. I felt very uncomfortable with him. I didn't know what to say to him.

I told him, you know, I just let him know I didn't want it to happen, I wanted it to stop.

She also stated that Hochman "touched my butt a couple times."

When asked what she said to Hochman, Hurst stated:

I never smiled. I would say stop, don't. I would push him away like exactly like this. Don't do it, you know. I didn't ever smile at him. I never flirted with him. I never in any way ever made him think that it was okay to do that.

Hurst testified that Hochman's touching her made her "feel very uncomfortable" and that she didn't like it. She further stated: "I was stressed out a lot and whenever, not a lot, I wasn't stressed out like every day. Whenever I knew he was coming, it would stress, just stress me out a lot."

Hurst testified that she finally told her boyfriend about Hochman touching her and that her boyfriend confronted Hochman and told him to stop. She said that after her boyfriend talked to Hochman, Hochman would come to collect the rent but did not touch her. She stated:

But at that point he wouldn't come over to fix anything. The pipes were leaking so bad, and there was multiple things wrong with that apartment. And I would be - - [my boyfriend] would be calling him and asking him to fix it. And that he knew what was wrong with it, and he wouldn't even fix it, to the point where [my boyfriend] called one of his maintenance men, and his maintenance man said, Coleman doesn't want us to do anything for y'all.

Hurst testified: "we quit paying rent after the first two months after [my boyfriend] confronted him, because it got so bad in that apartment. It was unlivable conditions." Hurst testified that her apartment became infested with rats, there was a leak that "was leaking in the hallway floor," a pipe in the kitchen that was leaking, and her daughter's bedroom carpet was soaked. Hurst testified that they had to move out for a week and live in a hotel due to the rat problem. She testified that Hochman tried to sue her twice, but that the suits were dismissed. When asked further about these suits Hurst could not remember if the first suit she spoke about was dismissed or continued, but she stated that the second time it was dismissed.

Hurst testified that:

[Hochman] had told me that he had - - he told me that he had ED, erectile dysfunction, he had a problem getting hard. And that he would ask me, like, talk to me about wanting to see me and that either he could help with the rent or he could pay me, either one.

And I never escalated the conversation. I didn't want that to happen. I just wanted it to be a tenant, and I just wanted to be the relationship between a tenant and a landlord, not any further than that.

Hurst stated on the rental application for the apartment that she had a cleaning service and that she made approximately $13,000 per year. At trial Hurst admitted: "None of that was true. I did own a cleaning service. I just wasn't using it." She stated that she had a business license for a cleaning service, but that she never used it and "never did anything with it."

Hurst testified that she owns Personal Occasions, an entertainment service. She testified that she does not promote prostitution in her business. She later admitted, however, that she has been convicted of prostitution. Hurst testified that she was arrested for prostitution approximately one month before filing suit and stated that the case was dismissed. She admitted later that she has to go back to court in approximately three months

-4-

on that charge. She stated that they gave her "like six months probation to be dismissed. It's basically dismissed."

At trial Hurst was shown an ad for Personal Encounters, and she stated that it was not her ad. When asked, she testified that she never has used the name Christian Jones. Hurst then was shown an internet advertisement containing her photograph and the name Christian Jones[2]. Hurst stated: "This is something my sister Charlotte did, she had brought it up for me, but I had no idea she had called me Christian Jones." Hurst again was asked if she was Christian Jones, and she stated: "I guess you would say that." She later was asked why she used a different name in the ad, and she stated: "Because I don't want people to know my real name."

When asked if Rita Brown ever worked for her cleaning service Hurst testified that she did not and that Ms. Brown worked somewhere else. When questioned further, Hurst admitted that she had testified during her deposition that Ms. Brown had worked for her cleaning service. Hurst testified at trial that Ms. Brown did one or two cleaning jobs for the cleaning service. When questioned further, Hurst admitted that Ms. Brown actually worked for Hurst's entertainment service.

Hurst testified that she had another employee who was named Nicole, but Hurst did not know Nicole's last name. When asked how she got in touch with Nicole, Hurst stated: "I had her number because she was a friend of mine that I had known for a long time…. I had known her since I was 20. I'm like 33 now, so like 13 years." When she was asked about knowing Nicole for 13 years and not knowing her last name, Hurst stated: "I'm trying to think Nicky Smith or something. It's Coleman, I think, and it's Nicky Coleman and Jeff Coleman."

Hurst testified that Nicole did one cleaning job for her. When asked whose property Nicole cleaned, she stated:

No, like I said, it was word of mouth. If I have friends, like, okay, one of them was Tom. And he's a guy from Michigan. He had one of them clean his

---

[2]A copy of the ad about which Hurst was questioned was introduced for identification purposes only at trial. This copy spells the name in question as "Kristin Jones." The trial transcript contained in the record on appeal shows that during the questions and answers about this ad the name was pronounced as "Christian Jones." It is clear from the record that the questions and answers elicited at trial were referring to this specific ad. As we use a direct quotation from the record in this Opinion, we utilize the spelling contained in the trial transcript.

house, and she charged him, that was Nicky, she charged him 120, and she took 40 of it. I forgot his last name. He had a daughter.

He lived - - at that time he lived off of East Brainerd and - - East Brainerd. I can find out the address for you. It's one of Colman's places he had bought from Colman.

At trial Hurst admitted that she had testified when her deposition was taken in May that she had quit the adult entertainment business approximately five months earlier. She also had testified that no one was working for her because she had quit the business. When asked at trial about testifying during her deposition that she had quit the adult entertainment business, Hurst testified:

No, at that time it was around three to four months ago. I had a client that I was seeing at that point. And I wasn't seeing him physically or anything - - but I wasn't seeing him physically at first. We got to know each other and as the months went by he started helping me pay my rent and stuff like that, and we had a relationship. And we still do at this point. But I have started back, and I don't see him as much as I did, but you know.

Hurst was asked who this customer was and she stated: "I guess his name - - God. Lynn, I'm sorry, Lynn Huts. I'm nervous. That's why I'm forgetting stuff." When asked about advertising in the newspaper during the time she claimed that she was not running her business Hurst stated: "December and May? I might have been. I mean, I'm not sure. I could have been lying to you about that."

Hurst's sister, Margaret Ann Chadwick, testified she was visiting Hurst on one occasion when Hochman was present and that she witnessed Hochman put his hand in Hurst's shirt and heard her sister tell Hochman to "[s]top it." Ms. Chadwick testified that a few minutes later Hochman approached her and reached for her tank top. She stated that she pulled away from him and that "it pulled my tank top back." Ms. Chadwick stated that Hochman then left the apartment. When questioned about this incident, Hochman denied that Hurst told him "no" on that occasion and vehemently denied touching Ms. Chadwick or tugging on Ms. Chadwick's top.

Rita Kay Brown testified that she has worked for Hurst in the entertainment business but not with the cleaning service. Ms. Brown testified that she had visited Hurst at her apartment and had witnessed Hochman touching Hurst's butt and Hurst trying to remove Hochman's hand and saying "[s]top." Ms. Brown testified about another occasion when she was visiting Hurst when she witnessed Hochman put his hand over a door sill to block Hurst

-6-

from leaving the room. Ms. Brown testified that Hurst "hollered" and Ms. Brown "came back to the hallway" and Hochman moved.

Hochman testified at trial and admitted that he had been sued for sexual harassment in Georgia by a tenant whom he stated had lived in one of his apartments for three months, not paid any rent, and caused about $3,000 worth of damages. He admitted that he lost this case at trial and that it is on appeal.

Hochman testified that when he met Hurst:

I did touch her hands. And soon after that I looked at her chest. I said, Are those yours? She said, Yes. Do you want to check them out? And I did. That was the first time I touched her. And she took it as casual as a handshake. She never said anything. She never said no. She, in fact, encouraged me.

He further testified:

Later in the year I made multiple trips to collect her rent, all based upon her calling me. We did play telephone tag. One day she would be in the dentist saying, I'm going to home. Whatever.

Going back to that first time. She had money on the partition that Ms. Chadwick just described. She was counting it out. After she counted it out, she gave it to me. She took her hand and put it on her chest, said that I ought to try her professional services of Personal Encounters, that I would enjoy it and get a lot of satisfaction. That went on periodically as I collected rent much of the time. And she wouldn't do it when anyone else was there. When we were alone, she did that quite frequently.

Hochman admitted that he touched Hurst: "Several times, all with encouragement," and further stated "she kept talking become [sic] how I ought to use her services and did I have any friends that might be interested. I said I would consider it."

Hochman testified that he "was very careful not to do any touching while a third party was present." He testified that he did not go to Hurst's apartment "other than for rent or any other purpose unless [he] got a call from her." Hochman admitted when asked that he vaguely recalled Hurst's boyfriend calling him and telling him not to call Hurst.

With regard to touching Hurst in front of her daughter Hochman stated:

I might say that in front of her daughter is a misnomer. In most cases her daughter was behind her and behind me holding on to her leg from the backside. Her daughter was just two and a half foot tall at the time and she couldn't see anything at any time anyway, but I can see why she's bringing it up here.

A transcript of a recorded telephone conversation between Hurst and Hochman, which occurred after Hurst had filed suit, was admitted as an exhibit at trial. At trial, Hochman was asked about this conversation, and he admitted that during the conversation, which was recorded without his knowledge, Hurst talked about Hochman putting receipts between her cleavage, grabbing her butt, and trying to pull her shirt up and that his response to those allegations was "yes, yeah." He testified that his understanding of the conversation was "[t]hat it's all right to touch her but not in front of her 3-year-old daughter." With regard to Hurst's allegations about problems with her apartment, Hochman claimed that the apartment was "strewn with food, creating her own rat problem." He denied telling his employees not to repair problems in Hurst's apartment.

Hochman testified that he and his wife are general partners in the Partnership. He was asked if anyone had interviewed his wife before she was selected as a general partner, and he stated that he "did that 50 years ago," and that his wife similarly interviewed him "50 years ago." When asked Hochman testified that there probably is a personnel file for every employee of the Partnership except him and his wife.

Hallie Hochman McFadden is Hochman's daughter and an attorney. Ms. McFadden testified that she is a partner in the Partnership but that she did not know if she was a general partner or a limited partner. Ms. McFadden testified that Hochman has not had a performance review of his services as a general partner and that she is not aware of a personnel file pertaining to Hochman. Ms. McFadden never did a background investigation on Hochman. Ms. McFadden did state that the Partnership has an employee manual. She testified that the employee manual addresses sexual harassment, but that she was not aware of any training regarding that subject.

Ms. McFadden was asked to summarize every action that the Partnership took to determine whether Hochman was doing a good job, and she stated: "[r]eview some financial records at the end of the year. Looking at the occupancy records of the properties. I think that's probably pretty close to it." She was asked if there were any discussions about whether the right employees were being hired or whether employees were being paid the right pay and she answered: "No" to these questions. Ms. McFadden was asked if there ever

had "been any action by the partnership to review any personnel decision, either hiring or firing, regarding the general partner," and she stated: "We've never seen a need to, so no."

James Edwards is employed by Hochman to do maintenance. Mr. Edwards has worked for Hochman for approximately seven years. Mr. Edwards testified that he did repairs in Hurst's apartment including putting in a kitchen faucet, repairing a toilet, and looking for mice. With regard to the mice, Mr. Edwards stated: "That's the first I run across anything like that. There was a little place in the bathroom sink that had a small hole where the pipe come in at, and we sealed that off. And that was the extent of that, the last I heard about it." Mr. Edwards was asked if Hochman ever told him not to make repairs in Hurst's apartment and he said "Oh, no, huh-uh." He also was asked if Hochman told him to slow down or delay in making repairs in Hurst's apartment and he stated: "No. That would create a bigger problem if we done something like that."

After trial, the Trial Court entered its Final Decree on October 14, 2011 that, *inter alia*, awarded Hurst a judgment against Hochman of $2,500 for battery; denied Hurst's claims for intentional infliction of emotional distress, discrimination under the Fair Housing Act, and punitive damages; and dismissed Hurst's claims against the Partnership. The Final Decree incorporated by reference the Trial Court's memorandum opinion finding and holding, *inter alia*:

> The allegation being that the defendant committed battery upon the plaintiff by way of uninvited and objected-to touching, inappropriate touching. And I find that the plaintiff has carried her burden of proof and has proven that allegation by a preponderance of the evidence.
>
> The plaintiff testified that touching was uninvited; that she objected to it; that she told the defendant to stop. That version was corroborated by two other witnesses who testified that they witnessed what the plaintiff stated that happened.
>
> And in a recorded telephone conversation, plaintiff brought that up, and the defendant did not deny that. Later in testimony [sic] said that it was the plaintiff who had initiated it, and the defendant said that the plaintiff invited the touching, and in fact took his hand and placed it upon her, but I find the weight of the evidence in this record is in favor of the plaintiff on that issue.
>
> In regard to the Fair Housing Act claim, Fair Housing Act prohibits discrimination in the terms of rental or in the provision of services in regard

to rental property and other property. And I find that the plaintiff has not carried her burden of proof in regard to the Fair Housing Act.

There's no evidence or certainly not sufficient evidence to prove a claim that she was discriminated against in the sense that she was charged normal rent, and she paid normal rent. She did say that the plaintiff - - excuse me, the defendant refused and failed to make repairs to her apartment, but I find the evidence to be in favor of the defendant on that issue.

Ms. Hurst made claims that certain things weren't done at the apartment that she requested. She did make claims about the rats, but the testimony of Mr. Hockman [sic] denied that. And more importantly, the testimony of Mr. Edwards, I think, refuted that claim. So I don't think there was any evidence, or any sufficient evidence that the plaintiff was deprived, was charged more rent, was charged - - services were expected for lesser rent, none of that was the case here, and I don't think there's sufficient proof that she was deprived of those services that were available to other tenants. So for the housing discrimination claim, or federal claim, is denied.

Hurst appeals to this Court.

## Discussion

Although not stated exactly as such, Hurst raises two issues on appeal: 1) whether the Trial Court erred in finding and holding that she failed to prove a violation of the Fair Housing Act; and, 2) whether the Trial Court erred in dismissing her claims against the Partnership.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in finding and holding that Hurst failed to prove a violation of the Fair Housing Act. With regard to the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*:

Sexual harassment is actionable under the FHA when it creates "a hostile housing environment" or constitutes "'quid pro quo' sexual harassment." *See Quigley v. Winter*, 598 F.3d 938, 946-47 (8th Cir. 2010). A defendant creates a hostile housing environment by subjecting a victim "to unwelcome sexual harassment, and the harassment was sufficiently severe or pervasive so as to interfere with or deprive [the victim] of her right to use or enjoy her home." *Id*. Quid pro quo sexual harassment "occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." *Id*. at 947.

*United States of America v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012).

Hurst argues in her brief on appeal that "[t]he trial court concluded that the Federal Housing Act does not cover sexual harassment." We disagree that this was the Trial Court's holding. The Trial Court found and held that Hurst had not carried her burden of proof with regard to her Fair Housing Act claim.

Hurst's brief cites to several cases involving Fair Housing Act claims and attempts to analogize the facts of these cases to the facts of her case. A careful and thorough review of the record on appeal, however, reveals that the evidence does not preponderate against the Trial Court's findings with regard to this issue.[3] The Trial Court specifically found that Hurst was charged and paid normal rent. The Trial Court found that Hurst's claims about the rat problem and Hochman's alleged refusal to fix problems were refuted by other evidence, particularly the testimony of Mr. Edwards. The Trial Court also found that Hurst was not deprived of any services available to other tenants. The evidence does not preponderate against these findings. Given the record now before us, we find no error in the Trial Court's holding that Hurst failed to carry her burden of proof with regard to her Fair Housing Act claim.

We turn now to Hurst's issue regarding whether the Trial Court erred in dismissing her claims against the Partnership. As this Court explained in *Hawkins v. Hart*:

> In order for an issue to be considered on appeal, a party must, in his brief, develop the theories or contain authority to support the averred position

---

[3]In *DiCenso v. Cisneros*, the Seventh Circuit Court of Appeals stated: "In this case, the existence of harassment is not at issue. The sole question is whether the incident of harassment that occurred is sufficient to state a cause of action under the Fair Housing Act. This is purely a question of law which we review *de novo*." *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996). Even if we determine that the existence of harassment was proven in the case now before us by virtue of the Trial Court's finding of battery and apply a *de novo* review, Hurst's evidence proven at trial still is insufficient to state a cause of action under the Fair Housing Act.

as required by Tennessee Rules of Appellate Procedure 27(a). "Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal." *Branum v. Akins*, 978 S.W.2d 554, 557 n.2 (Tenn. Ct. App. 1998); *see also Morris v. Snodgrass*, 886 S.W.2d 761 (Tenn. Ct. App. 1994); *Maryville Housing Authority v. Ramsey*, 484 S.W.2d 73 (Tenn. Ct. App. 1972). Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals.

*Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Our Supreme Court recently instructed in *Hodge v. Craig*:

An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7). *See Baugh v. Novak*, 340 S.W.3d 372, 381 (Tenn. 2011); *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010).

*Hodge v. Craig*, ___ S.W.3d ___, No. M2009-00930-SC-R11-CV, 2012 Tenn. LEXIS 720 at **19-20 (Tenn. Oct. 1, 2012). In *Adams v. Gardino* this Court recently stated:

This Court will not blindly search the record to determine if any errors were committed. *See Owen v. Long Tire, LLC*, No. W2011-01227-COA-R3-CV, 2011 Tenn. App. LEXIS 678, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011) ("this Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed"). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

[P]arties must thoroughly brief the issues they expect the appellate courts to consider. This principle is reflected in Tenn. R. App. P. 13(b) which provides that, with the exception of issues involving the subject matter jurisdiction of the trial and appellate courts, appellate review "generally will extend only to those issues presented for review." Thus, appellate courts may

properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules. *See State ex rel. D'Amore v. Melton*, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948).

*Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). "We have previously held that a litigant's appeal should be dismissed where his brief does not comply with the applicable rules, or where there is a complete failure to cite to the record." *Commercial Bank, Inc. v. Summers*, No. E2010-02170-COA-R3-CV, 2011 Tenn. App. LEXIS 382, 2011 WL 2673112, at *2 (Tenn. Ct. App. July 11, 2011).

*Adams v. Gardino*, W2011-00773-COA-R3-CV, 2012 Tenn. App. LEXIS 644, at **4-6 (Tenn. Ct. App. Sept. 17, 2012)[4].

With regard to this issue, Hurst's appellate brief provides Hurst's assertion that: "The record is insufficient to determine whether the trial judge had a basis for dismissing the claims against the Partnership. He made no findings so this Court could determine whether or not his conclusion was correct." Hurst apparently believes that she produced sufficient evidence to support her claims against the Partnership. Hurst's brief, however, provides no citations either to the law detailing the legal theories upon which she bases her claims against the Partnership or to the record showing what evidence was presented at trial that Hurst believes supports her theories of liability against the Partnership. It is not the role of this Court to search the record and research the law in order to construct an argument for Hurst. This issue has been waived.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Sarah Hurst, and her surety.

_____
D. MICHAEL SWINEY, JUDGE

---

[4]At the time of the filing of this Opinion a Rule 11 application for permission to appeal in this case was pending before our Supreme Court.