# IN THE COURT OF APPEALS OF IOWA

No. 23-1747
Filed February 5, 2025

**IOWA CIVIL RIGHTS COMMISSION,**
Plaintiff-Appellee,

**and**

**MARIA VAN GUNDY,**
Intervenor-Appellee,

**vs.**

**MCKILLIP MANAGEMENT, LLC and JAMES MCKILLIP,**
Defendants-Appellants.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

A defendant appeals a district court judgment on claims of hostile housing environment sexual harassment, quid pro quo sexual harassment, and retaliation brought under the Iowa Civil Rights Act. **AFFIRMED AND REMANDED WITH DIRECTIONS.**

Jaki Samuelson and Megan Happe of Whitfield & Eddy, P.L.C., Des Moines, for appellants.

Jordan Hutchinson of Hutchinson Law Firm, P.L.C., West Des Moines, for intervenor appellee.

Brenna Bird, Attorney General, Ian Jongewaard, Assistant Solicitor General, and Katie Fiala, Assistant Attorney General, for appellee.

Heard by Tabor, C.J., and Schumacher, Badding, Chicchelly, and Langholz, JJ.

**SCHUMACHER, Judge.**

The Iowa Civil Rights Commission (ICRC) brought a civil action against property manager James McKillip and his property management company, McKillip Property Management, LLC, (the LLC) for sexual harassment discrimination and retaliation.[1] McKillip was accused of creating a hostile housing environment and engaging in quid pro quo discrimination when he allegedly solicited a sexual relationship with a tenant who failed to make her rent payments. He was further accused of retaliation against the tenant after she denied his advances. McKillip later refused to continue participation in rental assistance programs and began eviction proceedings against the tenant. The tenant joined the litigation as an intervening party. The district court found against McKillip on all claims and ordered him to pay compensatory and punitive damages in addition to attorney fees. McKillip appeals.

I.      **Background Facts & Proceedings**

In 2019, Maria Van Gundy (hereinafter "Van Gundy") and her husband, who were experiencing financial insecurity and related housing instability, reached out to a homeless resource center through Primary Health Care (PHC). PHC helped place the Van Gundys and their teenage son in a family shelter. PHC then connected the Van Gundys with James McKillip to help secure longer-term housing. In November 2019, the Van Gundys entered into a lease agreement with the LLC to rent a duplex unit for an initial term of one year. As part of the

---

[1] The original complaint to the ICRC and immediate civil action also named the property's owners as defendants. These defendants were later dismissed from the suit.

agreement, PHC committed to paying the first nine months of the Van Gundys' rent to allow them time to secure future financial resources.

In May 2020, Van Gundy and her husband had a conflict that resulted in Van Gundy securing a temporary restraining order against her husband. Van Gundy later called McKillip to report some home damage that needed repair and to explain the situation. McKillip visited the property a few days later. As McKillip was leaving, and after telling Van Gundy not to worry and the damage was no big deal, McKillip mentioned he was looking for a new girlfriend.

According to the agreement between PHC and Van Gundy, the last rent payment from PHC was made in July 2020.[2] Although Van Gundy earned a small income restoring furniture, it was not enough to pay her rent. Van Gundy, who could not work after 2017 due to a medical condition, was also beginning to develop symptoms of paralysis and was trying to secure approval for permanent disability payments. She was still not approved for disability benefits in July and asked PHC for an extension on the rent assistance program. PHC denied the request.

Van Gundy's rent was not paid in August, September, or October. During these months, McKillip did not send her any delinquency notices or any notices of lease violation. Instead, McKillip gave Van Gundy the contact information for another rental assistance organization, HOME, Inc., that could potentially assist

---

[2] Van Gundy's lease agreement with McKillip contains no reference to the nine-month limitation. Instead, the agreement states that rent is "payable in advance of the First day of each and every month, via check from PHC, Inc."

with the three months of delinquent back rent and help with future rent payments. By October 30, Van Gundy had completed the intake process with HOME, Inc.

Around this same time in October, McKillip made multiple visits to Van Gundy's unit. During one stop, McKillip again mentioned to Van Gundy that he was looking for a new girlfriend. During a second stop, McKillip gave Van Gundy a ride to the store and back. Van Gundy testified that McKillip hugged her before leaving.

Before October, when McKillip began helping Van Gundy find a new rent assistance program, there was little communication between the two parties. Any business was conducted by phone call. After the October visits to Van Gundy's home, communications became much more frequent. One night near the end of October, McKillip called Van Gundy. He asked her whether "[she] enjoyed sex and if [she] enjoyed oral sex." Van Gundy ended the call. Fearing McKillip would revisit the topic, she avoided further phone conversations. The two communicated via text over the next week and a half.

While the initial text messages appear innocuous, on November 6, the nature of the text message exchanges shifted. McKillip told Van Gundy he could not help her if he could not talk with her. A few days later, McKillip sent Van Gundy pictures of a letter from the City of Des Moines identifying multiple ordinance violations concerning junk and unlicensed vehicles at Van Gundy's unit. The next morning, McKillip told Van Gundy she needed to remedy the violations or he would. Van Gundy responded that she was sick, had removed trash, and needed time to address the other violations. Ultimately, McKillip towed Van Gundy's

camper, removed the items from outside her house, and mowed her yard indiscriminately, including mowing over her garden.

Meanwhile, unknown to Van Gundy, she was approved for the HOME, Inc., rental assistance on November 2. The program approved payment for Van Gundy's past-due rent and four future months of rent. But on November 12, McKillip declined participation in the program and refused to accept the payment assistance. Four days after McKillip's refusal, McKillip issued Van Gundy a notice requiring her to pay all past-due rents within three days to avoid eviction. He then began eviction proceedings. Only then did Van Gundy learn she had been approved by HOME, Inc. These initial proceedings did not result in eviction. McKillip issued three more three-day notices within the next year.

The ICRC brought this action after investigating a complaint of sex discrimination and retaliation filed against McKillip and the LLC. Van Gundy joined the suit as an intervenor. McKillip represented himself throughout the district court proceedings. The LLC never responded to the complaint, and a default judgment entered against the management company. After holding a bench trial, the district court entered judgment against McKillip. The district court ordered McKillip to pay Van Gundy $10,000 in actual damages, $20,000 in punitive damages, and $43,553.07 for Van Gundy's attorney's fees and costs. McKillip appeals.[3]

Additional facts are detailed under the relevant issues below.

---

[3] The attorney representing McKillip on appeal has also entered appearance on behalf of the LLC. As discussed below, the LLC did not preserve error for appeal.

## II. Standard of Review

We review district court rulings on claims under the Iowa Civil Rights Act (ICRA) for legal error. *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 747 (Iowa 2006). "The district court's findings of fact are entitled to the weight of a special verdict and are binding on appeal if supported by substantial evidence." *Id.* When reviewing whether substantial evidence exists, "we view the evidence in the light most favorable to the judgment." *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004); *accord Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995).

"Evidence is substantial if a reasonable person would accept it as adequate to reach a conclusion." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). It is not enough to invalidate the substantial nature of evidence "merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Raper*, 688 N.W.2d at 36.

## III. Error Preservation

"The doctrine of error preservation has two components—a substantive component and a timeliness component." *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011). Under the timeliness prong, a party must bring the alleged error to the district court's attention before the court's ability to take corrective action has passed. *Id.* at 524. Failure to present the objection in a timely manner may result in failure to preserve error. *See, e.g., id.* at 524–25; *In re Marriage of Healey & O'Hare*, No. 15-1193, 2016 WL 6902324, *4 (Iowa Ct. App. Nov. 23, 2016).

The LLC has preserved none of the errors before this court. Default judgment was entered against the LLC on September 9, 2022. No motion to set

aside the default was filed.[4]  The LLC did not participate in the trial and did not present arguments contrary to the district court's eventual findings.

And only McKillip appealed the ruling issued by the district court on September 24, 2023, more than a year after default judgment against the LLC. Although the notice of appeal was purportedly brought by both McKillip and the LLC, the notice was filed by McKillip personally and without attorney representation.[5]  Because he is not a licensed attorney, McKillip may not represent the LLC in these proceedings.  *See Hawkeye Bank & Tr., Nat'l Ass'n v. Baugh*, 463 N.W.2d 22, 25 (Iowa 1990).  This same non-adherence to our procedural rules was the basis for the default judgment in the first place.  We do not entertain the LLC's appeal.  We affirm the district court's ruling against the LLC.  We proceed to the claims brought by McKillip individually.

## IV.  Analysis

## A.  Hostile Housing Environment Sexual Harassment

The ICRA prohibits housing discrimination based on a person's sex or sexual orientation.  Iowa Code § 216.8(1)(b) (2021).

Hostile-housing-environment-sexual-discrimination  claims  have  been recognized  by  federal  courts  under  the  Fair  Housing  Act  (FHA),  42  U.S.C.

---

[4] A party has sixty days from the entry of default judgment to move to set aside the default.  Iowa R. Civ. P. 1.977.  Failure to make such a motion may bar relief as to the defaulted defendant.  *See, e.g.*, *State ex rel. Hunter v. Hunter*, 501 N.W.2d 533, 535 (Iowa 1993) (finding relief from default judgment barred when the defendant did not file for relief until more than a year after entry of default).

[5] No attorney entered an appearance on behalf of the LLC until December 19, 2023, nearly two months after the notice of appeal was filed.

§§ 3601–31, and by a few state courts under similar state statutes.[6]  In Iowa, such a claim appears to have been directly addressed only once.  *See State ex rel. Dobbs v. Burche*, 729 N.W.2d 431, 434–36 (Iowa 2007).  While the Iowa Supreme Court discussed a hostile-housing-environment claim in *Dobbs*, the issue on appeal was limited to a discussion of whether the evidence was sufficient to support the district court's finding that the defendants "created a hostile housing environment for female tenants, in violation of section 216.8(2)."  *Id.* at 434.  The *Dobbs* decision did not interpret section 216.8 or decide what such a claim requires under Iowa law.  *Id.*

In this case, the district court interpreted section 216.8 to include "two types of sexual harassment in housing, quid pro quo and hostile housing environment."  Before reaching this conclusion, the district court reviewed the text of Iowa Code section 216.8(1) and seemingly compared it to section 3604(b) of the FHA.[7]

---

[6] *See DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010); *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1146–47 (9th Cir. 2024); *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993); *Fox v. Gaines*, 4 F.4th 1293, 1296–97 (11th Cir. 2021); *State Div. of Hum. Rts. v. Stoute*, 826 N.Y.S.2d 122, 127 (N.Y. App. Div. 2006); *Szkoda v. Ill. Hum. Rts. Comm'n*, 706 N.E.2d 962, 969 & n.1 (Ill. App. Ct. 1998).

[7] The portion of Iowa Code section 216.8 relevant here states:
> 1. It shall be an unfair or discriminatory practice for any person, owner, or person acting for an owner, of rights to housing or real property, with or without compensation . . . :
> . . . .
> b. To discriminate against any person because of the person's race, color, creed, sex, sexual orientation, gender identity, religion, national origin, disability, or familial status, in the terms, conditions, or privileges of the sale [or] rental . . . of any real property or housing accommodation or any part, portion, or interest in the real property or housing accommodation or in the provision of services or facilities in connection with the real property or housing accommodation.

Iowa Code § 216.8(1)(b).

Finding the two provisions "virtually identical," the district court turned to federal court decisions for guidance on the sexual-harassment-discrimination claims.

Drawing from federal caselaw, the district court determined that to prevail on a hostile-housing-environment claim, a plaintiff must show: (1) the victim was a member of a protected class; (2) the victim was subjected to unwelcome conduct; (3) the conduct was based on sex; and (4) the conduct was sufficiently severe or pervasive to alter the conditions of her housing.[8]  Because McKillip does not challenge the district court's application of law, we proceed to his challenge to the district court's factual findings—whether there is insufficient evidence to support the finding that McKillip's conduct was sufficiently severe and pervasive to alter the conditions of Van Gundy's housing.

Given the scarcity of Iowa caselaw specifically deciding issues of housing discrimination under section 216.8, we find persuasive authority in "federal court

---

In comparison, the corresponding provision of the FHA states: "[I]t shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).

[8] Courts that have reviewed hostile housing environment discrimination claims have relied on employment discrimination caselaw to guide their analysis.  *See, e.g.*, *DiCenso*, 96 F.3d at 1008; *Fox*, 4 F.4th at 1296 ("When interpreting the FHA, we—like our sister circuits—look to cases interpreting Title VII, which uses language virtually identical to the FHA's.").  In *Neudecker v. Boisclair Corp.*, the Eighth Circuit analyzed a hostile housing claim based on disability discrimination by applying the four elements needed to establish an employment disability discrimination claim.  351 F.3d 361, 364–65 (8th Cir. 2003).  Those four elements are: "(1) plaintiff is qualified individual with disability; (2) plaintiff was subject to unwelcome harassment; (3) harassment was based on his disability or request for accommodation; and (4) harassment was sufficiently severe or pervasive to alter conditions of employment and to create abusive working environment."  *Id.* at 365 (citing *Hiller v. Runyon*, 95 F. Supp.2d 1016, 1023 (S.D. Iowa 2000)); *see also White v. State*, 5 N.W.3d 315, 324 (Iowa 2024) (reciting similar elements as those required "to establish a hostile-work-environment claim under the ICRA").

decisions interpreting the FHA," *State v. Keding*, 553 N.W.2d 305, 307 (Iowa 1996), and our sister states' caselaw interpreting substantially similar statutory provisions, *Pippen v. State*, 854 N.W.2d 1, 30 (Iowa 2014). In doing so, we remain faithful to our obligation to construe the ICRA "broadly to effectuate its purposes."[9] *Pippen*, 854 N.W.2d at 28 (quoting Iowa Code § 216.18(1)); *accord Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 270 (Iowa 2019). The ICRA, like the FHA, was "intended to promote freedom of choice in housing and prohibit discrimination." *Renda v. Iowa C.R. Comm'n*, 784 N.W.2d 8, 16 (Iowa 2010).

McKillip urges there was insufficient evidence to establish his conduct was sufficiently severe or pervasive to establish a hostile housing environment. As the Seventh Circuit explained in *Wetzel v. Glen St. Andrew Living Cmty., LLC*, for

---

[9] Because federal courts have relied on Title VII decisions to guide their FHA analysis, *see supra* n.8, we must use caution when looking to federal court decisions interpreting the FHA for guidance on how the ICRA applies. *See Pippen*, 854 N.W.2d at 28. *But cf. Keding*, 553 N.W.2d at 307 ("Given the similarities between the two pieces of legislation, federal court decisions interpreting the FHA are persuasive when we consider the provisions of the Iowa [Civil Rights] Act."). We must stay faithful to the difference between our state law and Title VII; while Title VII is narrowly construed, the ICRA "shall be construed broadly to effectuate its purposes." *Pippen*, 854 N.W.2d at 28 (quoting Iowa Code § 216.18(1)). When seeking guidance from federal civil rights decisions, this federal versus state distinction of narrow versus broad construction is essential to proper application of the ICRA. *Id.* Yet the FHA contains language that "is broad and inclusive," and thus requires "a generous construction." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209–12 (1972); *cf. DiCenso*, 96 F.3d at 1010 (Flaum, J., dissenting) (insisting the majority too narrowly interpreted the severity element required to succeed on a hostile-housing-environment claim under the FHA even though "the majority may very well be correct in stating that [the defendant's] conduct would not be sufficient to give rise to a claim for sexual harassment under our Title VII precedent"). So the weight we give to federal court decisions will depend in part on the degree to which those decisions rely on narrowly construed Title VII caselaw or apply a broad interpretation of the FHA.

conduct to be sufficiently severe or pervasive, such that it is actionable under the FHA, it must:

> objectively interfere[] with the enjoyment of the premises or inhibit[] the privileges of rental. That standard requires us to consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, and whether it is physically threatening or humiliating rather than merely offensive. There is no "magic number of instances" that must be endured before an environment becomes so hostile that the occupant's right to enjoyment of her home has been violated. While isolated minor affronts are not enough, either a small number of "severe episodes" or a "relentless pattern of lesser harassment" may suffice.

901 F.3d 856, 862 (7th Cir. 2018) (cleaned up).

McKillip analogizes three earlier federal court decisions to make his case on the lack of severity or pervasiveness in his conduct. While we may look at these cases for guidance, we are not bound by them. *See Pippen*, 854 N.W.2d at 18.

In the only published decision relied on by McKillip, *DiCenso*, the harassing conduct consisted of a singular incident that was not accompanied by any physical threats: the landlord caressed the tenant's arm while implying an invitation to exchange sex for rent, and, after being rejected, the landlord yelled gendered epithets at the tenant through her closed apartment door. *See* 96 F.3d at 1006, 1008–09. Relying on guidance from previous Title VII employment discrimination decisions, the majority concluded such conduct "alone did not create an objectively hostile environment." *Id.* at 1009. In contrast, deferring to the position of the agency responsible for administering and interpreting the FHA, the dissent found "ample support" to conclude the "offensive conduct was sufficiently severe" to "unreasonably interfere[] with use and enjoyment of the premises." *Id.* at 1010 (Flaum, J. dissenting) (citation omitted).

McKillip claims additional support from two unpublished federal court decisions. In *Shellhammer v. Lewallen*, the trial court "found that the plaintiffs had failed to carry their burden of proof" for hostile housing environment when the landlord once asked the tenant to pose nude for him as she was cleaning an apartment for the landlord and once "asked her to have sexual relations with him and offered to pay her money for that purpose." No. 84-3573, 1985 WL 13505, at *1–2 (6th Cir. July 31, 1985) (per curiam). The trial court reasoned the conduct did not create a "burdensome situation" that made the tenancy "significantly less desirable than it would have been had the harassment not occurred." *Id.* at *2. On appeal, the only issue before the Sixth Circuit was whether the trial court's factual findings were clearly erroneous.[10] *Id.* Finding no such error, the Sixth Circuit panel affirmed the trial court's ruling. *Id.* at *3.

McKillip also relies on a summary judgment ruling by a federal district court in an action filed jointly by two tenant–plaintiffs, Macias and Rich, for their separate claims. *See Macias v. Lange*, No. 14cv2763, 2016 WL 1274762, at *1 (S.D. Cal. April 1, 2016). The alleged sexual harassment of Macias began after Macias's husband left her and continued for years. *Id.* at *12. The first occurrence took place when Macias went to the landlord's home to drop off the rent payment. *Id.* at *2. The landlord "locked the front and back doors [of his home] . . . approached [Macias], grabbed her around her waist, and told her that she had beautiful breasts and asked whether he could kiss her." *Id.* Macias pushed the landlord away, told

---

[10] Reversal would have required the reviewing court to conclude "with [a] definite and firm conviction that a mistake [had] been committed." *Shellhammer*, 1895 WL 13505, at *2 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

him she would "pretend this isn't happening," and continued the business she had gone to his place to handle. *Id.* During later incidents, the landlord brushed against Macias's breasts and buttocks and made inappropriate sexual comments as she cleaned homes for him to help make her rent payments. *Id.* If Macias told the landlord "she didn't want to clean," the landlord made comments implying threats of eviction. *Id.* at *3. And "[s]ince his comments always alluded to eviction, she was afraid of being evicted."[11] *Id.*

The district court in *Macias* concluded there were material issues to be decided by a factfinder as to Macias's claim and denied the landlord's motion for summary judgment as to her. *Id.* at *12. A jury later found in Macias's favor on her hostile housing environment sexual harassment claim under the FHA and under California's corresponding state statute. *See Macias v. Lange*, No. 14cv2763, 2017 WL 1155327 at *1 (S.D. Cal. March 28, 2017) (noting Macias's favorable trial outcome). The jury awarded Macias $55,320.00 in damages. *Id.*

Macias's outcome contrasts with that for the other plaintiff in *Macias*, a tenant named Rich. Over a two-and-a-half-year time-period, Rich identified ten to twenty "instances of alleged sexual harassment in which her husband was at home for more than half of them." *Macias*, 2016 WL 1274762, at *13. These instances generally involved objectifying comments and gestures. *Id.* Rich testified that "it seemed like [the landlord] was trying to hug" her during two encounters. *Id.* On other occasions, Rich left her house and found the landlord shirtless while working

---

[11] McKillip's argument fails to distinguish between the two tenant–plaintiffs in *Macias* and assigns this fact to tenant Rich, whose FHA claim was dismissed when the district court granted summary judgment to the landlord on that issue. *See Macias*, 2016 WL 1274762, at *3, 14.

on a separate lot he owned behind Rich's property. *Id.* Rich never accused the landlord of soliciting sex from her in any of these incidences. *Id.*

Finding Rich failed to show any "triable issues of fact whether Defendant's acts were severe or pervasive," the district court granted the landlord's motion for summary judgment as to Rich. *Id.* at *14. The *Macias* court reasoned, "[w]hile Rich alleges between 10–20 instances of inappropriate behavior, her husband was home for more than half of them, which lessens the severity and pervasiveness of [the landlord]'s actions." *Id.* (footnote omitted).

We are unpersuaded by McKillip's attempt to draw a connection between these out-of-state cases and the more egregious facts here. Van Gundy's testimony described an escalation of boundary-pushing that began when McKillip commented to Van Gundy that he was looking for a new girlfriend. Such escalation included the phone call in which McKillip began asking Van Gundy about her feelings toward sex and specific sex acts. Van Gundy became "very uncomfortable" in talking to McKillip on the phone.

There were also dozens of text messages between Van Gundy and McKillip, beginning with messages sent on October 28, 2020, around the same day as the discomforting phone call, and continuing frequently. Van Gundy testified that she believed many messages from McKillip were veiled attempts to discuss a future sexual relationship with her. Other evidence, including a text message to Van Gundy and testimony from McKillip's ex-wife, supports the suggestion that McKillip had indeed become careful to avoid leaving a record of

improper conduct.[12] And while McKillip testified that his messages were not sexually motivated, the district court found Van Gundy to be a more credible witness. *See Hamer v. Iowa C.R. Comm'n*, 472 N.W.2d 259, 262 (Iowa 1991) ("Credibility assessments are largely left to the fact finder, and we give deference to those findings."); *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005) (same).

The district court's finding below also considered the power imbalance between Van Gundy and McKillip. Such consideration is consistent with how other courts have reviewed the egregiousness of a defendant's conduct and further supports the district court's findings. *See, e.g.*, *Quigley*, 598 F.3d at 946 (describing the landlord's conduct as "even more egregious" because "[the landlord] subjected [the tenant] to these unwanted interactions in . . . a place where [the tenant] was entitled to feel safe and secure and need not flee"); *Macias*, 2016 WL 1274762, at *13 (discussing the tenant's failure to establish when she became unemployed and thus financially vulnerable, and adding that because the tenant's husband lived with her, the landlord's conduct was "less egregious"). Van Gundy testified that because she could not make her rent payments on her own and was afraid of becoming homeless with her teenage son, she felt she had to consider McKillip's suggestion of a sexual relationship. By November 6, when it seems McKillip realized Van Gundy would not submit to his efforts, McKillip messaged, "If

---

[12] McKillip texted Van Gundy, "I was interested I [sic] hearing more about you and your life, but [I] can wait until we're met in person, whenever that may be. No place to hang out in public," followed by, "Or, I can continue to text, but anything in writing becomes evidence. Lol!" McKillip's ex-wife also testified that she had seen a text message from McKillip to a woman who had been renting from McKillip, saying "If you still love me, call me," and that his affair with the former tenant was the reason for their divorce.

[I] don't feel like you are trying, I have no choice but to spend MY time on more productive things. Have you made the right choice?" He then added, "I just evicted someone this morning. Its [sic] not that hard."

McKillip's later messages to Van Gundy, beginning again on November 9, were business related and only concerned ways in which Van Gundy violated the lease agreement. When Van Gundy was unresponsive still on November 10, McKillip messaged that he had arranged remedial actions which would be taken in two days if she did not contact him to discuss. Van Gundy responded: "I am sick I am right now headed to go get tested for [COVID-19] again you need to give me some time just because I won't sleep with you dumb and now you get to be a dick now." McKillip did not address this accusation. The next day, after McKillip texted a warning much like the day prior, Van Gundy sent, "You know [McKillip] I didn't plan on telling a single person about your proposal but means [sic] you want to go down this road you aren't giving me much choice." Again, McKillip ignored Van Gundy's indirect accusation.

These facts are distinguishable from *DiCenso* because here, as opposed to an isolated incident, McKillip's conduct continued for two to three weeks and became increasingly hostile toward Van Gundy. And to the extent these facts are similar to *DiCenso*, we find it notable that the majority opinion relied significantly on guidance from cases applying the more narrowly construed Title VII. *Compare DiCenso*, 96 F.3d at 1008–09 ("[The landlord's] conduct . . . was much less offensive than other incidents which have not violated Title VII."), *with id.* at 1010 (Flaum, J. dissenting) (deferring to the agency's FHA interpretation and conclusion

that the conduct was sufficiently severe to be actionable, despite acknowledging the less favorable interpretation under Title VII).

We also consider McKillip's reliance on the *Macias* case and the similarities and distinctions to the tenant–plaintiffs there. Tenant Rich never alleged the landlord solicited sex from her; some of the conduct Rich alleged, such as the landlord's shirtless maintenance work on an adjacent lot, did not suggest intentional harassment; and Rich was accompanied by her husband during roughly half of the instances. *Macias*, 2016 WL 1274762, at *13. In contrast, the same landlord began harassing tenant Macias after her husband left; he made sexual comments to Macias while she cleaned for him to pay her rent; and, knowing she was financially vulnerable, he made implied threats of eviction whenever she told him she no longer wanted to clean. *Id.* at *2–3, 12.

We see the facts of the immediate case as more like tenant Macias's case, for whom a jury eventually found in favor, rather than tenant Rich, whose claim was dismissed on summary judgment. McKillip knew Van Gundy had her husband removed from the home and that she was financially vulnerable. Although Van Gundy's husband was around at the time McKillip sexually questioned Van Gundy over the phone, McKillip intentionally crafted the questions so Van Gundy could furtively respond. McKillip's subsequent suggestive text messages demonstrate a similarly furtive intent, constructively isolating Van Gundy as she experienced the harassment. And like *Macias*, the evidence is adequate for reasonable minds to conclude repetitive insinuations "created a burdensome situation which caused the tenancy to be significantly less desirable than it would have been had the harassment not occurred." *Shellhammer*, 1985

WL 13505, at *2; *see also Dobbs*, 729 N.W.2d at 433. Such interference with the enjoyment of the tenancy, especially when the landlord is aware of the tenant's financial vulnerability, can be enough to constitute severe or pervasive harassment.

Upon careful consideration and given our role on appeal, we conclude the district court's finding is supported by substantial evidence.[13]

## B.     Quid Pro Quo Sexual Harassment

"'Quid pro quo' harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." *Quigley*, 598 F.3d at 947 (quoting *Honce*, 1 F.3d at 1089); *cf. Dobbs*, 729 N.W.2d at 434, 436 (affirming the district court's finding against defendants on quid pro quo sexual harassment in the housing context under Iowa code section 216.8). Like hostile-housing-environment claims, courts reviewing quid pro quo sexual-harassment claims draw guidance from federal employment discrimination claims. *See, e.g.*, *Quigley*, 598 F.3d at 947; *Fox*, 4 F.4th at 1296–97. Liability may arise when "tangible housing benefits are conditioned on a lessee's submission to conduct of a sexual nature and that adverse housing consequences result from the lessee's refusal to submit to the conduct." *Honce*, 1 F.3d at 1094 n.1 (Seymour, J., dissenting) (cleaned up); *cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998) (characterizing quid pro quo cases as those "based on threats which are carried out").

---

[13] Although we acknowledge that the facts here may permit a reasonable person to draw different conclusions, that is not enough to overturn the district court's conclusion when reviewing for legal error. *See Raper*, 688 N.W.2d at 36.

**1.** **Rental Assistance Program Participation**

McKillip first argues that the district court's determination that McKillip committed quid pro quo sexual harassment hinges on McKillip's refusal to accept rental assistance payments and thereby impermissibly violates the voluntary nature of participation in such programs. He claims the acceptance of such assistance was not a term, condition, or privilege of Van Gundy's tenancy and that he had a legitimate nondiscriminatory reason to justify his actions. We are unpersuaded by this argument.

Van Gundy found the property managed by McKillip through the housing resource center at PHC. Van Gundy's rental of the property began because of and depended on McKillip's voluntary participation in rental assistance programs. And after the PHC assistance ended and Van Gundy became three months late on her rent, McKillip's conduct showed his continued interest in participating in such programs. He gave Van Gundy contact information for HOME, Inc., called the non-profit himself, and urged Van Gundy to connect with the organization's representative. At no point during the months of August, September, or October— during which Van Gundy was in default on rent—did McKillip issue any notices of delinquency or begin eviction proceedings. Instead, his conduct showed an intention to help Van Gundy secure future rental assistance funding so she could remain living on the property.

Contrast that conduct with McKillip's behavior beginning on November 6. On that date, McKillip's texts for the first time insinuated he would evict Van Gundy. Two days of no contact followed. On November 9, McKillip texted Van Gundy images of a letter from the City of Des Moines, dated November 3, giving notice of

city code violations at Van Gundy's property and requiring remedial action within seven days of receipt. McKillip's message said, "You need to take care of this IMMEDIATELY WITHOUT FAIL." Van Gundy, who was ill at the time, was unable to address the issues. On November 12, McKillip removed everything on the outside of Van Gundy's home, including patio furniture, a grill, and her lawn care equipment. McKillip also mowed over everything in Van Gundy's yard, including the garden next to the house.

Also on November 12, McKillip refused the funding from HOME, Inc., for which Van Gundy had been approved. The funding would have covered the past due rent and paid for another four months of future rent. On November 16, McKillip issued Van Gundy a three-day notice to pay rent or leave the premises. He subsequently began eviction proceedings. McKillip went from providing Van Gundy with significant help in securing new rent assistance to refusing to accept the secured financial aid and initiating eviction proceedings, all within a week.

To the extent that McKillip's liability arises from his withdrawal from participating in rental-assistance programs, we emphasize that the question of liability under the ICRA depends on the totality of the circumstances. *See White v. State*, 5 N.W.3d 315, 324 (Iowa 2024) (noting Iowa courts review hostile work environment claims under a totality-of-the-circumstances test); *cf. Wetzel*, 901 F.3d at 862 (analyzing a harassment claim under the FHA based on the totality of the circumstances). There are no doubt scenarios in which a landlord's refusal to participate in voluntary rent assistance programs will not create an actionable

discrimination claim. *See, e.g.*, *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998). But that is not the case here.

McKillip's sudden refusal to accept the payments from a rental assistance program amounts to his decision to revoke her right to continue living on the property. Such a right is a tangible housing benefit to which the lease agreement entitled McKillip. And although McKillip claims he refused the new assistance because of the multiple lease violations, the evidence indicates McKillip expressed zero concern for lease violations until after he became frustrated by Van Gundy's unwillingness to develop a sexual relationship. There is substantial evidence to support the district court's finding that Van Gundy suffered a tangible housing detriment, the benefit of which the ICRA protects.

## 2. Conditional Housing

McKillip also argues that there is a lack of substantial evidence to show he conditioned Van Gundy's continued tenancy on her submission to requests for sexual favors. He points out that he never explicitly offered to exchange rent for sex and never threatened to increase her rent.

An actionable claim for quid pro quo harassment is not dependent on the defendant explicitly stating the existence of the conditions. *Quigley*, 598 F.3d at 947 (explaining quid pro quo harassment occurs when benefits are "explicitly or implicitly" conditioned on sexual favors). It may be enough to succeed on a claim merely when an implied condition can reasonably be inferred from a defendant's pattern of conduct. *See West v. DJ Mortgage, LLC*, 164 F. Supp. 3d 1393, 1400 (N.D. Ga. 2016).

In concluding McKillip conditioned Van Gundy's continued housing on her submission to his sexual requests, the district court reasoned:

> There was also a clear implication that McKillip was asking Van Gundy to exchange sexual favors in order to continue living in the apartment. His advances did not start until it was clear Van Gundy could no longer afford rent. He asked her if she liked different kinds of sex. He sent her a kissing emoji and clearly made a reference to "swapping germs" the next time they saw each other. Over the course of several days, he repeatedly asked her to call him or meet him in person. He stated he did not want to text lest the messages become evidence. He stated he was anxious to meet her in person and asked if she was anxious too. These are not the behaviors of a landlord merely seeking the payment of rent. The testimony and the evidence in this case paints a picture of a man who realized his female tenant was in a vulnerable position and sought to exploit that vulnerability for sexual favors.

Despite McKillip's argument that Van Gundy suffered no adverse housing consequence because she was not actually evicted until after he was terminated, his attempts to evict Van Gundy demonstrate his intent to carry out the implied threat of eviction. As discussed above, when Van Gundy's rejection became clear, McKillip refused to follow through with the rental assistance program that he initially found for Van Gundy. Only after refusing to accept this assistance did McKillip issue a notice of failure to pay rent. And only after the rejection did he begin eviction proceedings.

Giving due deference to the district court's witness credibility determination, *see Smidt*, 695 N.W.2d at 22, there is substantial evidence McKillip conditioned Van Gundy's continued tenancy on her submission to his sexual advances.

## C.    Retaliation

McKillip next disputes the judgment for Van Gundy on the retaliation claim. The ICRA prohibits "[a]ny person [from] discriminat[ing] or retaliat[ing] against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under [the ICRA]." Iowa Code § 216.11(2). The ICRA also contains a provision all-but-identical to the retaliation provision of the FHA.[14]

To prove a prima facie case of retaliation a plaintiff must establish (1) the plaintiff was engaged in protected conduct, (2) a reasonable person in the plaintiff's position "would have found the challenged action materially adverse," and (3) "the materially adverse action was causally linked to the protected conduct." *Carrington v. City of Des Moines*, 481 F.3d 1046, 1050 (8th Cir. 2007) (reviewing a decision applying both Iowa and federal law). *Id.* During the trial, the parties litigated the retaliation claim under the traditional *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp v. Green*, 411 U.S. 792 (Iowa 1973), and they renew that approach on appeal.[15]

---

[14] Both the ICRA and FHA state that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" the housing provisions of the respective acts. Iowa Code § 216.11A; 42 U.S.C. § 3617. Accordingly, we consider federal cases analyzing FHA retaliation claims highly persuasive. *Keding*, 553 N.W.2d at 307.

[15] Under this framework, the plaintiff bears the burden of establishing a prima facie case of retaliation. *Carrington*, 481 F.3d at 1050. Upon making a prima facie case, the burden then shifts to the defendant to provide a legitimate, non-retaliatory reason for their action. *Id.* If the defendant satisfies that burden, the burden then shifts back to the plaintiff to prove the defendant's proffered reason was actually "pretext, a cover up for retaliation." *Id.* (quoting *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980)). We note our supreme court no longer relies on the McDonnel Douglas test to instruct juries for ICRA retaliation cases. *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019). But the appellant does not challenge the framework used by the district court on appeal.

McKillip agrees that Van Gundy proved a prima facie case of retaliation,[16] but he argues there is not substantial evidence to support the district court's finding that his purported legitimate, nondiscriminatory reason for refusing the rental assistance and beginning eviction proceedings was pretextual. McKillip offers a thorough reinterpretation of the facts to show how his refusal to accept the rental assistance and the eviction attempts that followed resulted from the culmination of frustration with Van Gundy's apparent lack of urgency in securing rent assistance, her lease violations, and the ongoing challenges with contacting Van Gundy to resolve such issues.

Even if a reasonable fact finder could find McKillip's interpretation persuasive, our review asks whether the evidence adequately "supports the finding actually made." *Raper*, 688 N.W.2d at 36. McKillip emphasizes much of Van Gundy's evidence is vague and circumstantial, and he points out, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Peoples Mem'l Hosp. v. Iowa C.R. Comm'n*, 322 N.W.2d 87, 91 (Iowa 1982). To this end, we again defer to the district court's credibility determination—which, for McKillip, was "strained"—and consider it along with the record evidence, including that evidence which largely casts doubt on McKillip's transparency and truthfulness.

---

[16] McKillip's agreement that Van Gundy established a prima facie case of retaliation, for which suffering a materially adverse action is an essential element, aligns with our conclusion that McKillip's refusal to accept rental assistance is a tangible housing detriment. Assuming the admission does not waive McKillip's argument altogether, such an admission adds to the reasons for our decision discussed in Section IV.B.1., above.

Considering our discussions above, there is substantial evidence to support the conclusion McKillip's stated reasons were pretextual.

## D.     Punitive Damages

The district court awarded Van Gundy $20,000 in punitive damages. McKillip claims this award is unwarranted and unreasonable.[17]

"We review an award of punitive damages for correction of errors at law."[18] *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005); *accord Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017).   Again, factual findings that are supported by

---

[17] We need not address McKillip's argument related to attorney's fees as those arguments were made conditional on this court reversing the district court's liability determination.

[18] The parties disagree over our standard of review for punitive damages.  McKillip and the ICRC both claim our standard of review is de novo.  Both cite an Eighth Circuit decision in which the plaintiff brought a Title VII sexual harassment hostile-work-environment claim.  *See Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 616 (8th Cir. 2000).  Van Gundy, as the intervenor-appellee, states our review is for correction of errors at law.  Her brief cites a case from the Iowa Supreme Court in which punitive damages were discussed on an intentional-tort claim.  *See Papillion v. Jones*, 892 N.W.2d 763, 765 (Iowa 2017).  No party addresses or acknowledges this disagreement.  And given the lack of Iowa caselaw on sexual harassment housing discrimination, there is no Iowa law directly addressing the specific issue here.  *Cf. Dobbs*, 729 N.W.2d at 435 (finding the appeal of the district court's damages award moot after the parties settled the issue before the appeal was decided).

Furthermore, ICRA employment-discrimination claims and housing-discrimination claims diverge on the issue of punitive damages.  Generally, punitive damages are not allowed on ICRA employment-discrimination claims. *Ackelson v. Manley Toy Direct, LLC*, 832 N.W.2d 678, 689 (Iowa 2013); *see also Godfrey v. State*, 898 N.W.2d 844, 880 (Iowa 2017) (Cady, C.J., concurring in part and dissenting in part), *overruled on other grounds by Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023).  In contrast, they are expressly provided for by statute in ICRA housing-discrimination claims.   Iowa Code § 216.17A(6)(a); *see also Ackelson*, 832 N.W.2d at 688 (contrasting Iowa's employment and housing discrimination statutes).  Accordingly, we apply the standard of review used in punitive damages disputes by our supreme court in other substantive areas of law, rather than finding guidance in persuasive authorities applying federal employment discrimination law.

substantial evidence are binding on this court. *Papillion*, 892 N.W.2d at 770. But we are not bound by a district court's legal conclusions. *Raper*, 688 N.W.2d at 36.

"Iowa Code chapter 668A . . . governs recovery of common law punitive damages." *Papillion*, 892 N.W.2d at 773. Common law punitive damages are permitted only where it is found that the defendant's conduct "constituted [a] willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a).

The ICRA authorizes a district court to award punitive damages on discriminatory housing claims. *Id.* § 216.17A(6)(a). A district court may award punitive damages "if [it] finds that a discriminatory housing or real estate practice has occurred or is about to occur." *Id.* § 216.17A(6). When a claimant seeks punitive damages for violations under a statutory scheme that specifically provides for punitive damages, "we read [chapter 668A and the statute authorizing scheme-specific punitive damages] together and attempt to harmonize them.'" *Papillion*, 892 N.W.2d at 773 (quoting *In re A.M.*, 856 N.W.2d 365, 372 (Iowa 2014)).

The focus of McKillip's argument is on the reasonableness of the award. McKillip contends his conduct was not sufficiently reprehensible to warrant punitive damages.

"The purpose of punitive damages is to punish a person for their civil wrongdoing and to protect the public by deterring the defendant and others from engaging in similar future conduct." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 487 (Iowa 2014). Courts generally consider three factors when determining the reasonableness of punitive damage awards. *Wolf*, 690 N.W.2d at 894. These are

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the trier of fact and the civil penalties authorized or imposed in comparable cases.

*Id.* (cleaned up) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

"The degree of reprehensibility of the defendant's conduct is said to be the most important indicium of the reasonableness of a punitive-damage award." *Id.* When considering the degree of reprehensibility of a defendant's conduct, courts consider whether: (1) the defendant caused physical as opposed to economic harm; (2) the defendant showed an "indifference to or a reckless disregard of the health or safety of others"; (3) the defendant's victim was financially vulnerable; (4) "the conduct involved repeated actions or was an isolated incident"; and (5) the harm resulted from "intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419; *see also Wolf*, 690 N.W.2d at 894. And, "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419.

We find the existence of four of these factors to be supported by substantial evidence. Van Gundy suffered both emotional and economic damage. *See Wolf*, 690 N.W.2d at 894. Sexual harassment and retaliation are both forms of intentional conduct.[19] *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) ("Retaliation is, by definition, an intentional act."). Van Gundy was

---

[19] Though not directly disputed, we note that intentional misconduct satisfies the willful or wanton standard as required under chapter 668A.

reliant on rental assistance from the beginning of her tenancy. And it was her fear of homelessness that made her feel obligated to consider McKillip's proposal. McKillip "held a certain level of power over [Van Gundy] and her family." *Quigley*, 598 F.3d at 954. Finally, the harm was caused not by accident but by McKillip's disregard for Van Gundy's civil right and his intentional retaliation upon being denied a sexual relationship.

In *Quigley*, an FHA sexual-harassment case wherein the landlord was found liable for hostile housing environment sexual harassment, quid pro quo sexual harassment, and retaliation, the Eighth Circuit found an appropriate ratio between punitive and actual damages to be four-to-one. *Id.* at 955–56. The district court in *Dobbs* issued the defendant $100,000 in sanctions and ordered him to pay $20,000 in compensatory damages (a five-to-one ratio). 729 N.W.2d at 434 n.1. Here, the punitive damages issued amounted to only two times greater than the actual damages awarded. We conclude a two-to-one ratio "is an appropriate ratio under the circumstances of this case" and for the purposes of punishment and deterrence of future misconduct. *Quigley*, 598 F.3d at 956.

## E. Appellate Attorney Fees

Van Gundy requests appellate attorney fees. We conclude she is entitled to a reasonable award of appellate attorney fees. But because an attorney fee affidavit has not been filed, we remand to the district court for a determination of reasonable appellate attorney fees.

## IV. Conclusion

Substantial evidence supports the district court's factual findings on the hostile-housing-environment and quid pro quo sexual-harassment claims, and the

retaliation claim. And we find no legal error in the district court's assessment of punitive damages. The costs of this appeal are assessed to McKillip. We remand to the district court for the determination of reasonable appellate attorney fees for Van Gundy. Accordingly, we affirm and remand for a determination of reasonable appellate attorney fees.

**AFFIRMED AND REMANDED WITH DIRECTIONS.**